George SEARCY, Etc., et al.,
Plaintiffs-Appellants,

v.

Eugene C. WILLIAMS, Etc., et al.,
Defendants-Appellees.

No. 80–7517.

United States Court of Appeals,
Fifth Circuit.
Unit B

Sept. 21, 1981.

Roney, Circuit Judge, filed an opinion dissenting in part.

Laughlin McDonald, Neil Bradley, Christopher Coates, Atlanta, Ga., Peggy Mastroianni, Washington, D.C., for plaintiffs-appellants.

Adams, Barfield & Dunway, Ronald Barfield, David Bruce Dunaway, Tommy Richard Hankinson, Thomaston, Ga., for defendants-appellees.

Before MORGAN, RONEY and KRAVITCH, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This appeal arises out of a suit brought by black citizens who are registered voters in the City of Thomaston, Georgia, against the City of Thomaston Board of Education and its members. The plaintiffs challenged *inter alia* the composition and method of selection of the school board as violative of the Fourteenth and Fifteenth Amendments and 42 U.S.C. §§ 1971(a)(1) and 1973. Ruling on the basis of submitted pleadings, affidavits, documents, and briefs, the district judge found for the defendants. Persuaded by the peculiar facts of the case, however, we find it necessary to reverse.

## I. FACTUAL BACKGROUND

In 1915 in order to create a public school system for the City of Thomaston, the Georgia General Assembly passed a statute that created an independent school system from the then existing R. E. Lee Institute. 1915 Ga. Laws 848. R. E. Lee Institute was a private school incorporated in 1906 for the benefit of "white pupils and patrons;" however, its failing financial status in 1915 required that action be taken in order to ensure educational opportunities for the children of Thomaston. The enabling legislation that established the public school system named R. E. Lee Institute's board of trustees (hereinafter the board) as the Thomaston Board of trustees (hereinafter Board of Education) and adopted the same method utilized by the former board for the subsequent election of members to the Board of Education. This method of selection provided that each year one board member would retire and that member, together with the remaining board, would elect the new board member. A referendum by the people in 1918 approved the legislation. The statute was reaffirmed in 1933 and amended in 1978; however, it has continued throughout the years to maintain its self-perpetuating form of election to the Board.

The members of the Thomaston Board of Education, in addition to their role as school board members, exist nominally as the board of trustees for the private corporation. However, since 1958 the board as trustees has met only twice—once in 1974 to delete the word "white" from the phrase "white pupils and patrons" in the institute's charter, and again in 1977 to authorize the conveyance of all property owned by the institute to the Board of Education. After the board transferred the property to the Board of Education in 1978, the state amended the charter of the City of Thomaston to provide that the Board of Education would constitute the board of trustees only as long as the members chose to do so.

Steps toward desegregation in the City of Thomaston school system began in 1965;

however, the dual school system that existed was not dismantled until September of 1970. Many of the school traditions of the all-white school, including the name R. E. Lee Institute, were adopted over those of the former all-black school. At the time this lawsuit was filed, no black had ever served on the Thomaston Board of Education.[1] After the lawsuit was filed, a vacancy occurred on the Board and the members elected Reverend Willis Williams as the first black man to serve on the Board in its sixty-one year history. Shortly thereafter the Board also adopted a policy that it would not discriminate in filling further vacancies and that it would affirmatively seek to ensure that all segments of the community were represented on the Board. Subsequently, in a public referendum held in 1979 to determine whether the citizens of Thomaston preferred to consolidate the city school system with the county school system, the public overwhelmingly voted to maintain the system as it existed. In June of 1980 the district judge issued his order, holding that the system for election to the school board was not inherently unconstitutional or unconstitutional in its creation or operation. The district judge further held that the Voting Rights Act, 42 U.S.C. §§ 1971(a)(1) and 1973, did not apply.

## II. FOURTEENTH AMENDMENT CLAIMS

Appellants first argue that the district judge erred in his ruling that the statute, enacted in 1915 and amended in 1978, naming the R. E. Lee Institute board of trustees as the Thomaston Board of Education and permitting the Board's self-perpetuation, is constitutional on its face. Their argument is that the legislation adopting the board of trustees as the Board of Education necessarily mandated an all-white Board of Education because the institute's charter establishing the school for "white pupils and patrons" required that the trustees be white. Although appellants' logic

leads to the conclusion that the Board of Education necessarily under the facts would have been lily-white, we disagree that the statute is unconstitutional on its face as requiring an all-white Board. The statute refers to the school as a "legally chartered school," but the legislation does not specifically incorporate any arguable requirement under the charter that the board be composed only of white members. The district court's ruling that the statute is facially constitutional was more than "technically correct" as conceded by the appellants; it was legally correct as well.

In their next line of attack the appellants argue that the statute is discriminatory in purpose and effect and should therefore be struck down as unconstitutional in its application. Both the appellants and the district judge below rely primarily on a line of cases culminating in the recent Supreme Court decision of *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a case that required proof of a racially discriminatory purpose in a dilution case. However, before plunging into the most modern analysis involving purposeful discrimination, we find it useful to consider a case decided nearly one hundred years ago by the Supreme Court, but still relevant to our analysis today.

The case of *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), involved a municipal ordinance that was racially neutral on its face, but administered in a manner that clearly indicated a racially discriminatory motive. The ordinance prohibited the operation of laundries in the City of San Francisco without a special permit from a board of supervisors, unless the laundry was constructed of brick or stone. The facts reveal that out of 320 laundries in the city, 240 were owned by Chinese persons. All of the laundries in the city except for ten were constructed of wood, and thus were subject to the ordinance. The board of supervisors granted

---

1. Indeed, the record reveals that a few families in Thomaston dominated the membership of the Board throughout the years, with the Hightower family placing six members on the Board, the Adams family placing five, and the Hinson, Varner and Thurston families placing two each.

exceptions to all 80 of the non-Chinese laundry operators; however, permits were refused to the more than 200 Chinese applicants who sought exceptions to the ordinance. *Id.* at 358–359, 374, 6 S.Ct. at 1065–1066, 1073. Faced with such statistics in a case involving the actual administration of the ordinance, as opposed to the potential administration of the statute, the Court concluded:

> [T]he facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the State itself, with a mind so unequal and oppressive as to amount to a practical denial by the State of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the Fourteenth Amendment to the Constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution. . . .
>
> The fact of this discrimination is admitted. No reason for it is shown, and the conclusions cannot be resisted, that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which in the eye of the law is not justified.

*Id.* at 373–374, 6 S.Ct. at 1072–1073. The Supreme Court made no effort to inquire into any specific purpose of enactment of the statute, finding that the facts required a conclusion of discrimination.

A more recent case relevant to our inquiry, and in some respects similar to *Yick Wo v. Hopkins, supra,* is *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). That case involved another challenge to a Georgia statutory method of selection of local school boards whereby the school board members were selected by the grand jury which was in turn selected from a list composed by a judge-appointed jury commission. The Supreme Court held that the system which granted discretion to the jury commissioners to exclude anyone not "upright" and "intelligent" was not unconstitutional on its face or unconstitutional as having no conceivable purpose or effect other than to permit the commissioners to discriminate against blacks. However, the Court held that the jury list actually composed by the jury commissioners revealed a substantial disparity between the number of Negroes on the list and the Negro population in the county. This disparity was unexplained, particularly in light of the 171 blacks out of 178 persons disqualified for lack of intelligence or uprightness. These statistical disparities established a prima facie case of jury discrimination that the defendants failed to rebut, and thus the jury lists were declared unconstitutional under the Fourteenth Amendment.

■ *Turner v. Fouche, supra,* and *Yick Wo v. Hopkins, supra,* represent a line of cases in which statutes challenged as unconstitutional are constitutional in apparent purpose, but utilized in a manner to discriminate against a certain segment of the population. *See* L. Tribe, *American Constitutional Law,* Section 16–18, p. 1028 (1978). In these cases the fatal discriminatory purpose is inferred from the overwhelmingly convincing statistical evidence of unexplained disparity. *See also Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The challenged application of the statute often involves discretion or subjective criteria utilized at a crucial point in the decision-making process. For example, in *Yick Wo v. Hopkins* the board of supervisors exercised absolute discretion in granting exceptions, and the jury commission in *Turner v. Fouche* applied subjective criteria to create the jury list from

**1008**

which grand jury members were chosen.[2] These cases, although not entirely on point with the present case, are relevant to our inquiry because the statute in the present case, based on overwhelming convincing statistics, has been discriminatorily applied for 61 years by the city school board acting as an arm of the state. The school board makes its own selection of new members to the Board, and the choice of new members is entirely subjective. The evidence that no black was chosen in a 61 year period is highly indicative of discriminatory administrative action. Thus, under the analysis of the discriminatory administration cases, the present case involves an unexplained prima facie case of discrimination.[3]

The present case is unlike the discriminatory administration cases cited above in that those cases involve challenges to isolated particular actions. *Yick Wo v. Hopkins, supra,* involved the application of a criminal statute to the appellant, and *Turner v. Fouche, supra,* involved a challenge to the composition of a jury list. This case involves discriminatory action "born in the iniquity" of a segregated school system, and perpetuated over a period of years by the school board's failure to appoint a black person to the Board until the time that this lawsuit was filed. For this reason, the appellants have challenged the statute as unconstitutional in application and seek to

have the statute struck down. Apparently because the case involves a challenge to the system of selection to the school board, and systems may be struck down as discriminatory in impact, the appellants and the district judge below have analogized to the discriminatory impact cases, particularly *City of Mobile v. Bolden, supra,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47. Although *City of Mobile v. Bolden* may be significant for analyzing when a discriminatory system may be struck down, it is important to keep in mind that the present case involves more than a mere discriminatory impact where the statute is neutral on its face and in its administration. Any discriminatory impact in this case arises from the fact that discriminatory appointments[4] to the board have occurred systematically for the 61 years preceding this lawsuit. The proof of discriminatory purpose so difficult to muster in a discriminatory impact case is more readily apparent in a case such as this one involving overwhelming statistical evidence of discriminatory administration of a statute.

In the discriminatory impact cases, particularly those involving at-large elections as in *City of Mobile v. Bolden, supra,* the Supreme Court places a heavy burden on the plaintiffs to show that the impact is in some manner related to a discriminatory purpose. In *City of Mobile v. Bolden, su-*

**2.** In these cases, the administrative officials exercised a kind of discretion different from the discretionary power granted to elected public officials in making appointments to positions "with substantial policymaking importance." *James v. Wallace,* 533 F.2d 963 (5th Cir. 1976). Policymaking appointments of the latter type are those made by an elected official that are essential to carrying out the political mandate of the people. *See Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 615, 94 S.Ct. 1323, 1330, 39 L.Ed.2d 630 (1974).

**3.** A subtle issue hidden within the comparison of this case to a discriminatory administration case involves the question of what right of the people is protected by the Fourteenth Amendment in this case. Clearly, the appellants have no right to be appointed to the Board of Education. However, as the Supreme Court stated referring to school board participation in *Turner v. Fouche,* 396 U.S. 346, 362–63, 90 S.Ct. 532, 541–42, 24 L.Ed.2d 567 (1970), "the appel-

lants ... do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualification. The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." Although the Supreme Court was discussing a freeholder requirement for appointment to the school board, the same right would exist where blacks were systematically excluded from participation on a school board that ostensibly has no actual requirements for membership, but rather depends entirely on the arbitrary discretion of the school board members.

**4.** *See* note 6 and accompanying text *infra.* As we discuss later in this opinion, the selection of school board members, although couched in terms of an "election," is actually for all practical purposes by appointment.

*pra,* 446 U.S. at 66, 100 S.Ct. at 1499, the Court held that in a discriminatory impact challenge to an at-large election scheme the plaintiff must prove that the plan was "conceived or operated" purposefully to further discrimination.[5] In that case the Court found that the fact that no black had ever been elected to the city commission, together with the historical evidence of discrimination, was insufficient to establish a prima facie case of discrimination.

■ The district court in the present case applied the analysis of *City of Mobile v. Bolden,* to support the conclusion that no illegal discrimination existed in the present case. However, in analogizing to *City of Mobile v. Bolden* in this manner, the district court failed to recognize a crucial distinction between election cases and nonelection cases. The present case, although characterized by the appellants as an election case, is, according to our analysis, an appointment case. The legislation provides for the "election" of new Board members, but as in *Sailors v. Kent Board of Education,* 387 U.S. 105, 109, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967), a system by which a small number of elected or appointed persons select a school board (or fill its vacancies) is basically an appointive system. Appointed school board systems are permissible under the Constitution[6] so long as the appointments are not made in a manner that systematically excludes an element of the population from consideration. *Cf. Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). However, appointments other than those made to positions entrusted with carrying out particular policies of an elected official[7] can be scrutinized under the Four-

teenth Amendment with a more jaundiced eye than can elections. Elections are a product of the general right to vote and may be affected by subtle factors unrelated to racial motives. In an election case, the fact that no black has ever been elected under a particular system of election does not necessarily reflect purposeful discrimination; whereas, in an appointment case, the fact that no black has ever been appointed to a particular position, offered without explanation, is an indicator of purposeful discrimination. The district court erred in its straightforward comparison of *City of Mobile v. Bolden* to the present case. Although *City of Mobile v. Bolden* may be relevant to the degree this case involves discriminatory impact, the straightforward comparison is too simplistic for the unique set of facts before the court today. A more discerning analysis is required.

■ *City of Mobile v. Bolden, supra,* 446 U.S. at 66, 100 S.Ct. at 1499, requires that in a discriminatory impact case the plaintiff must show that the statute in question was "conceived or operated" as a purposeful device to further discrimination. As we have indicated, the discretionary element in the administration of the legislation in this case, together with the evidence of the manner in which the statute was actually administered, compels an inference of purposeful discrimination. The school board utilized the statute to exclude black participation on a school board that established educational policies for black and white students alike, and this obviously impacted unfairly on blacks. According to the Supreme Court's use of the disjunctive "or" in the phrase "conceived or operated," and according to our own language in *McMillan*

---

5. For a thorough discussion of the plurality opinion in *City of Mobile v. Bolden, supra,* see Judge Kravitch's opinion in *McMillan v. Escambia County, Florida,* 638 F.2d 1239 (5th Cir. 1981), *cert. dismissed* —— U.S. ——, 102 S.Ct. 17, —— L.Ed.2d —— (1981).

6. *Sailors v. Kent Board of Education supra,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650. We note, however, that the appointment system in this case is particularly unique in that once the initial Board "appointment" was made, the

subsequent appointments to the Board were totally removed from public influence. Most appointive systems involve appointments by elected officials, or at least officials appointed by another elected official. *See, e. g. Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974); *Turner v. Fouche, supra; Sailors v. Kent Board of Education, supra.*

7. *See* note 2 *supra.*

*v. Escambia County, Florida*, 638 F.2d 1239, 1244 (5th Cir. 1981), operation alone of a statute as a purposeful device to further discrimination may invalidate it. However, the historical evidence in this case of a segregated school system existing at the time this legislation created the school board out of a white private school indicates in the least that this system for selecting school board members was tainted with a segregative origin. This taint was not present in *City of Mobile v. Bolden, supra* or *McMillan v. Escambia County, Florida, supra*, where the at-large election schemes in those cases were first utilized at a time when blacks were widely disfranchised and did not pose a political threat. Although discriminatory purpose was most likely not the sole purpose in establishing this method of selection for the Board, the historical reality of segregation at least suggests the possibility of a racially discriminatory purpose. Furthermore, the tainted origin of the school board has been carried forward to the present day by the self-perpetuating method of selection to the Board. Regardless of whether the school board selection scheme was purposefully conceived to further discrimination, however, the system has clearly operated purposefully to further discrimination. We hold, therefore, that this unique system for selection of the school board that was operated in a discriminatory manner, together with the self-perpetuation of the Board of Education that originated from an all-white board of trustees, is violative of the appellants' rights under the Fourteenth Amendment.[8]

## III. REMEDY

Because we have held that the statute involved in this case has been applied in a manner that violates the Fourteenth Amendment it is unnecessary to consider the appellants' arguments based on the Fifteenth Amendment and the Voting Rights Act. However, as indicated in our opinion, this case involved an appointive rather than an elective scheme, and thus the district court was correct in holding that voting rights did not apply. Our only remaining task is to consider what action is necessary to remedy the constitutional violation.

Ordinarily a case involving discriminatory administration of a statute would be remedied by eliminating the particular offensive activity and enjoining further discrimination. In this case, however, the offensive activity has occurred over a 61-year period, and at this present date the discrimination has arguably been corrected by the "voluntary" action[9] of the defendants in appointing a black person to the Board. Because this person has been appointed to the Board, we cannot order appointment of another black. However, because the appointment was made in the face of litigation, we have no assurance that the pattern of past discrimination is forever broken. We do not question the good faith of the current Board of Education in adopting its "affirmative action poli-

---

8. We emphasize the uniqueness of this system that was created from a board of trustees that was arguably *required* by charter to be all-white, and at least under the facts necessarily would have been all-white. The statute required this original Board to self-perpetuate in the sense that the Board chose its own new members. Although self-perpetuation is not per se unconstitutional, *see Byrd v. City of San Antonio, Texas*, 587 F.2d 184 (5th Cir. 1979), the self-perpetuation of this Board tainted with a segregative past violates our constitutional sense of fairness. We also suggest that the self-perpetuation of a board performing such an important government function as the one in this case might present different problems than the Public Service Board in *Byrd v. City of San Antonio, Texas*, which merely performed the proprietary function of managing public

utilities owned by the city. However, we reserve that matter for another day.

9. Without intending to impugn the present school board's motive, we place little significance in the fact that a black person was appointed in the heat of this litigation. Rather than indicating a permanent change in the pattern that existed, the appointment of the black member suggests that indeed litigation was required to correct the situation, particularly in light of the fact that the Board was otherwise isolated from public pressure. *See note 6 supra. See also Kirksey v. Board of Supervisors*, 554 F.2d 139, 146 (5th Cir. 1977) ("[L]itigation was required to remove discrimination . . . and that litigation has worked.").

cy," [10] but we are not satisfied that the discriminatory taint of the past has been sufficiently dissipated. An order simply enjoining future discrimination by the Board in its consideration of potential Board members is an ineffective remedy.[11]

Because the appellants have demonstrated to our satisfaction that this statutory scheme for selection to the board of education has been purposely and systematically utilized to exclude blacks from the opportunity to participate in the educational policy-making process, we find that the only effective remedy in this case is to invalidate the statute. When a statute is viewed as discriminatory in purpose and effect and its defects cannot be cured by an injunction prohibiting unfair application, the legislation may be deemed invalid per se. *See Louisiana v. United States*, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). Although this statute is not unconstitutional on its face, it originated out of a segregated school system and required that the initial Board of Education be established from an all-white school's board of trustees. The segregative effect of the past has been perpetuated by this statute that permitted the original all-white Board absolute discretion in choosing its own new members. *Cf. Kirksey v. Board of Supervisors*, 554 F.2d 139 (5th Cir. 1977). In order to dissipate the taint of the segregative past in this unique system of school board selection, we find it necessary to reverse the district court and invalidate this statute. Because a new selection method must be established by the state legislature, we express no opinion concerning any new method of selection to the school board.[12] We reverse and remand to the district court with orders to retain jurisdiction over the case until a new system for selection is chosen.

REVERSED and REMANDED.

RONEY, Circuit Judge, dissenting in part:

I respectfully dissent from the Part III Remedy portion of the Court's opinion. Nothing said therein can justify a federal court's requiring the state legislature to implement a new system for selection of school board members. The statute has been upheld as constitutional. Only its application was improper. Although the court has broad remedial powers, its task is simply to correct the condition that offends the Constitution. *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971).

In a similar challenge to Alabama's jury selection statute, the Supreme Court upheld the statute but found its application to be discriminatory. *Carter v. Jury Commission of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). Rather than invalidate the statute, the Court remanded the case back to the district court recognizing that "[t]he federal courts are not incompetent to fashion detailed and stringent injunctive relief that will remedy any discriminatory application of the statute at the hands of the officials empowered to administer it." *Id.* at 336–37, 90 S.Ct. at 527.

The district court should be left free to develop a remedy which would assure nondiscriminatory appointment of Board members, an avenue of affirmative action already having been opened by the Board. An appropriate remedy structured on the

---

10. As indicated previously, the Board, after selecting its first black member, adopted a policy seeking to ensure that all segments of the population were represented on the Board and refraining from discriminating in filling further vacancies.

11. We acknowledge the Supreme Court's holding in *Carter v. Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), that injunctive relief was sufficient in that case to remedy the wrongs of abused discretion; however, we find that the facts of this case in light of the

specific history of segregation in the school systems distinguish it and suggest that "the law . . . was subsequently carried forward for the purpose of fostering racial discrimination." *Id.* at 336, 90 S.Ct. at 527.

12. As we have stated, the appellants have no right to an elected school board. However, we note our reluctance in condoning a system as isolated from public influence as was the one in this case. *See* note 6 *supra.*

present statute could well result in better representation of minority groups in the non-discriminatory selection of Board members, than if the existing statute is invalidated and the legislature adopts a method which, while constitutional, might well have the ultimate effect of replacing a now integrated Board with an all-white Board.

Having found the statute facially constitutional, the Court then goes too far by invalidating it as a remedy. The statutory scheme is not itself discriminatory. It is "capable of being carried out with no racial discrimination whatsoever." *Smith v. Texas*, 311 U.S. 128, 130–31, 61 S.Ct. 164, 165–66, 85 L.Ed. 84 (1940) (footnote omitted); *Carter*, 396 U.S. at 335, 90 S.Ct. at 526. The case should be remanded to the district court to allow it to fashion a suitable remedy.