**Darius IRBY, et al., Plaintiffs,**

v.

**Susan H. FITZ–HUGH, et al., Defendants.**

**Civ. A. No. 87–0633–R.**

United States District Court, E.D. Virginia, Richmond Division.

May 16, 1988.

Gerald T. Zerkin, Gerald T. Zerkin & Associates, Susan L. Quig–Terry, American Civil Liberties Union Foundation of Virginia, Richmond, Va., Kathleen L. Wilde, Laughlin McDonald, Neil Bradley and Derek Alpharan, American Civil Liberties Union Foundation, Inc., Atlanta, Ga., for plaintiffs.

Guy W. Horsley, Jr., Mary Sue Terry, Gail S. Marshall, K. Marshall Cook, Paul J. Forch, Gregory J. Haley and Joan Murphy, Office of the Atty. Gen., Richmond, Va., for Fitz–Hugh, in her official capacity as Secretary of the Virginia State Bd. of Elections, and Virginia State Bd. of Elections.

Mayo K. Gravatt, Blackstone, Va., for Long, Daniels, Eppes, Jenkins and Haga-

man, in their official capacities as members of the School Bd. Selection Com'n of Nottoway County, and Powell, King and Ragland, in their official capacities as members of the Electoral Bd. of Nottoway County.

E.M. Wright, Jr., Buckingham, Va., for Agee, La Sueur and Morris, in their official capacities as members of the School Bd. Selection Com'n of Buckingham County, and Shepard, Morgan and Steger, in their official capacities as members of the Electoral Bd. of Buckingham County.

Robert A. Bruce, Farmville, Va., for Carwile, Clark, Garnett, Hendley, Maxwell, Moore, Scott and Stokes, in their official capacities as members of the Bd. of Sup'rs of Prince Edward County, and Watson, Ferguson and Venable, in their official capacities as members of the Electoral Bd. of Prince Edward County.

William W. Bennett, Jr., Bennett and Rand, Halifax, Va., for Tate, Conner, Abbott, Clark, Colman, Henderson and Matthews, in their official capacities as members of the Bd. of Sup'rs of Halifax County, and Woltz, Conner and Farrington, in their official capacities as members of the Electoral Bd. of Halifax County.

Michael R. Packer, Office of the City Atty., Petersburg, Va., for Farley, Edwards, Bigley, Cuthbert, Mickens, West and East, in their official capacities as members of the City Council of the City of Petersburg, and Aldridge, King and Phillips, in their official capacities as members of the Electoral Bd. of the City of Petersburg.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on the parties' cross motions for summary judgment pursuant to Fed.R.Civ.P. 56. The plaintiffs are black representative voters from Nottoway, Buckingham, Prince Edward, Halifax Counties and the City of Petersburg, the Southern Christian Leadership Conference and Citizens for a Better America. They challenge Virginia's appointive process for selecting school board representatives on the grounds that an appointive process was chosen and is maintained with the intent to deprive blacks of the equal opportunity to participate in the selection of school board members. The defendants are the Secretary of the State Board of Elections, the State Board of Elections, Nottoway and Buckingham Counties' School Board Selection Commissions and Electoral Boards, Prince Edward and Halifax Counties' Boards of Supervisors and Electoral Boards, and Petersburg's City Council and Electoral Board. These are the bodies responsible for the appointment of school boards and the administration of elections.

The plaintiffs allege violations of the First, Thirteenth, Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act of 1965 (as amended in 1982), 42 U.S.C. § 1973. For the reasons set forth below, the plaintiffs' claims under the First Amendment, Thirteenth Amendment, and the Due Process clause of the Fourteenth Amendment are dismissed for failure to state a cause of action upon which relief can be granted. Resolution of the remaining claims on summary judgment is inappropriate on the incomplete record before the Court. The plaintiffs must substantiate the continuing discriminatory effects suggested by the current record. For example, it appears from the limited information before the Court that the manner in which a county chooses a school board has a dramatic effect on black representation. Blacks are underrepresented, in counties with a significant black population, in most instances where school board selection commissions choose school board members. Conversely, the State and localities, to prevail, must demonstrate that the actions they took to bring about a new age of racial equality in Virginia are causally related to the proportional representation of blacks on school boards.

The plaintiffs challenge each of the four ways school boards are appointed in Virginia. Under Va.Code § 22.1–34 *et seq.*, the school board is appointed by a three person school board selection commission which is in turn appointed by the local circuit court

judge. Nottoway and Buckingham Counties use this system of appointment. Counties which do not have either a County Executive, County Manager, County Board or Urban County Manager form of government are included in § 22.1–34. Under a 1970 amendment, Va.Code § 22.1–41, *et seq.*, Nottoway, Buckingham and similarly situated counties can hold a referendum to transfer the appointment power from the non-elected school board selection commission to the governing body.

Under the second means, Va.Code §§ 15.-1–609 (County Executive), 15.1–644 (County Manager), 15.1–708 (County Board), or 15.-1–770 (Urban County Manager), the county board of supervisors appoints members of the school board. Prince Edward and Halifax counties employ this system. In cities and towns, such as Petersburg, the governing body appoints the school board, Va. Code § 22.1–50. In three school districts in Virginia, none of which are a party to this litigation, the county board of supervisors and the city's city council appoint the school board where the school district overlaps the city and county boundries, Va. Code § 22.1–53.

Although the record is incomplete, there are some facts that are not in dispute.[1] Virginia's General Assembly in 1870 made the decision to appoint rather than to elect school board members. The Public Free School Law, passed July 11, 1870, provided for the appointment of "school trustees" by the State Board of Education. *Acts of the General Assembly of Virginia*, 1869–70, Chapter 259, (July 11, 1870), 408–09. (Hereinafter "Acts") The three school trustees appointed in each district had duties similar to modern school boards. In

1877, the General Assembly transfered the appointment decision from the state school board to local school trustee electoral boards comprised of the county superintendent of schools, the county judge and the attorney for the Commonwealth. *Acts*, 1876–77, Ch. 12, (Jan. 11, 1877), 9–10. Although the selection switched back to a central board at times, the local appointive bodies were responsible for selecting school board members at the turn of the century.

At the Virginia Constitutional Convention of 1901–02, the Convention considered the possibility of electing local school boards. The Committee on Education recommended that the new constitution provide:

> In each school district there shall be elected by the people three school trustees, whose terms of office shall be four years: Provided, that in cities and towns constituting separate school districts school trustees shall be elected or appointed, as may be provided by law.

Report of the Proceedings and Debates of the Constitutional Convention, State of Virginia, 1901–02, 1828 (1928). Mr. McIllwain, a proponent of the provision, reported that the rationale for the change was that the current system resulted in nepotism, inefficient school systems and a lack of responsiveness to the people. *Id.* Immediately, an amendment was offered which replaced the words "elected by the people" and substituted the words "selected in a manner provided by law," and deleted the last phrase beginning "Provided."

The amendment prompted a debate led by Mr. J.B.T. Thornton, a member of the Committee on Education, who announced:

---

1. The plaintiffs submitted the declaration of Peyton McCrary, a historian who has conducted extensive research in the field of Virginia and Southern voting practices. The declaration is in the form of an affidavit, and Professor McCray has gathered a wide range of information to support his conclusions and opinion that the appointive system of selecting school boards has been maintained to deprive blacks of participation in the process. Although the defendants have not submitted an affidavit contradicting Professor McCrary's conclusions, McCrary's statement is insufficient to support a motion for summary judgment. An affiviant usually has

first hand knowledge of the facts he attests to. McCrary's declaration, on the other hand, rests largely on secondary sources—hearsay. Therefore, although his declaration is insufficient for the purposes of a summary judgment motion, his testimony at trial as an expert witness would be probative. *See Hunter v. Underwood,* 471 U.S. 222, 228–29, 105 S.Ct. 1916, 1920–21, 85 L.Ed.2d 222 (1985).

The plaintiffs have asked that the Court take judicial notice of the facts contained in Prof. McCrary's statement. To the extent appropriate under Rule 201, Fed.R.Evid., the Court has acceded to that request.

[I] shall vote against the report made by the committee for this reason ... Although it is claimed that the white people control absolutely their local affairs throughout the State, it is a mistake, and if this report is adopted, as presented here, there are a number of counties in the State in which we will have negro [sic] trustees. That is a condition of affairs that is abhorrent ... I believe we would be doing injustice to the white people of the State to undertake to place election of trustees in the hands of the people.

Proceedings at 1829. His comments were echoed by another, Mr. Eggleston:

I endorse everything that has been said by the gentleman from Rockingham on this subject, and will add that, as the matter now stands, we would not only be liable, but likely to have negro [sic] school trustees in a good many districts in the State, if the trustees are going to be elected by the people.

*Id.* After changing the period of appointment from 4 years to that to "be proscribed by law," the Convention passed the amended provision. The provision in effect left it up to the General Assembly to decide the method of selection.

In 1904, the General Assembly enacted a law that provided for the establishment of local school trustee electoral boards comprised of the superintendent, the Commonwealth's attorney and a private citizen appointed by the circuit court judge. *Acts,* Extra Session 1902–04, §§ 1450, et seq., 806–812. In 1926, the composition of the electoral board was changed to three citizens all appointed by the local circuit judge, *Acts,* 1926, Chap. 106, 104, and changed again in the 1930's to allow for counties with county manager or county executive forms of government to have the school board appointed by the Board of Supervisors.

In 1947, the General Assembly amended the statutes governing school board selection to provide certain counties the option to elect school board members. *Acts,* 1947, Chap. 61 (Jan. 30, 1947), 113–16. Arlington County thereafter elected a five-member school board in an at-large election. In 1956, the General Assembly repealed the local election provision and adopted Va. Code § 22–83.2 which stated that "no school board shall be elected by popular vote in and for any county or city." *Acts,* 1956, Chap. 591, (March 31, 1956), 949–50. The repeal of the elective option followed in the wake of the Supreme Court's ruling in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

The appointive process has also been modified slightly in recent years. In 1970, counties that use school board election commissions (Va.Code § 22.1–34) were granted authority to change to a system, if the populace voting by referendum agreed, where the elected governing body appoints the school board members. Va.Code § 22.1–42. The General Assembly also added in 1980 a provision that allows a county to return to the use of using school board election commissions. Va.Code § 22.1–45. A 1985 amendment requires that a public hearing be held "to receive the views of citizens within the school division" on school board members who may be appointed by the county Board of Supervisors. Va.Code § 22.1–29.1 (1985).

In this case, the Court is asked to consider these state statutes and the interplay of several constitutional amendments. In seeking to draw the boundries of the scope of each of these constitutional provisions, the Court must be careful not to read one amendment so expansively as to render another amendment superfluous. Prior precedent and reason suggest that the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment reach further in these circumstances and afford greater protection than the First and Thirteenth Amendments. Consequently, only the Fourteenth Amendment's Equal Protection clause, the Fifteenth Amendment and the Voting Rights Act possibly provide the plaintiffs protection from the alleged evils of Virginia's statutory scheme. Therefore, the plaintiffs First Amendment, Due Process and Thirteenth Amendment claims must be dismissed.

The First Amendment protects the right to associate for political purposes and to participate in the political process at the local level. This protection does not create any entitlement for blacks to have greater participation in the appointment of school board members than afforded by Virginia's facially neutral statutes. *See Sailors v. Kent Board of Education*, 387 U.S. 105, 108, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967) (The Court found no constitutional prohibition to appointive school boards.) The plaintiffs argue that the statutes violate the First Amendment as applied because the 1904 and 1956 General Assemblies enacted and maintained the statutory scheme for the purpose of denying blacks access to the political process. Because the statutes were enacted for an illegal motive, they violate the First Amendment, assert the plaintiffs. The Supreme Court has repeatedly rejected such an argument:

> It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. As the Court long ago stated: "The decisions of this Court from the beginning lend no support whatever to the assumption that the judiciary may restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exercised." *McCray v. United States*, 195 U.S. 27 [24 S.Ct. 769, 49 L.Ed. 78] (1904).

*United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968) *See also, Arizona v. California*, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931).

To prevail the plaintiffs must demonstrate "that the *inevitable* effect of a statute on its face may render it unconstitutional." *O'Brien*, 391 U.S. at 384, 88 S.Ct. at 1683 (emphasis added). "Inevitable effect" has been narrowly defined. In *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), the Court invalidated a tax on publications because the statute on its face imposed a tax only on publications—infringing the publications' freedom of press rights. Similarly in *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), the Court overturned the redrawing of municipal boundaries because the "inevitable effect," 364 U.S. at 341, 81 S.Ct. at 127, was "to deprive the petitioners of their right to vote for no reason other than they were Negro." *O'Brien*, 391 U.S. at 385, 88 S.Ct. at 1683. "In these cases, the purpose of the legislation was irrelevant, because the inevitable effect—the 'necessary scope and operation,' *McCray v. United States*, 195 U.S. 27, 59 [24 S.Ct. 769, 777, 49 L.Ed. 78] (1904)—abridged constitutional rights." *Id.* The statutes attacked in the instant case have no such inevitable unconstitutional effect. Although several original supporters of an appointive school board scheme hoped the effect of the statutes would exclude blacks from school boards, the effect was by no means "inevitable." Indeed, one of the central disputes in this litigation is the effect of these statutes on blacks' role in the selection of and participation on school boards. Virginia's appointive scheme does not facially place a unique burden on blacks such as a newspaper tax, nor does it exclude black participation with the precision of a municipal boundary.

For similar reasons the plaintiffs' claim under the Due Process clause of the Fourteenth Amendment cannot withstand the defendants' summary judgment challenge. The Fourteenth Amendment provides in part that no "state shall deprive any person of life, liberty, or property, without due process of law ..." A party seeking relief under the Due Process clause must establish first, that he has been deprived by the state of "life, liberty, or property," and second, that the deprivation occurred without "due process." No liberty interest or property right is implicated here. No constitutional provision prohibits the appointment of school boards, *Sailors v. Kent County*, 387 U.S. 105, 108, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967), nor is there any First Amendment right at stake.

The plaintiffs rely upon *Duncan v. Poythress*, 657 F.2d 691, *reh. denied*, 664 F.2d

291 (5th Cir.1981), *cert. dismissed*, 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982), but this case is inapposite. In *Duncan*, the governor of Georgia appointed a state Supreme Court justice instead of holding a special election to fill a vacancy created by a resigning justice. The appointment contravened state law, as the court noted: "It is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law ..." *Id.* at 704. Here, the act of appointing school boards does not violate any law. It does not contravene a pre-existing right to vote.

The plaintiffs also suggest that the discriminatory intent of the legislature in enacting these statutes make them a violation of due process. This argument fails for the same reasons as their First Amendment argument. Legislative intent standing alone is not enough. *Palmer v. Thompson*, 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438 (1971) (Speaking about the Equal Protection Clause, the Court stated: "[N]o case in this Court had held that a legislative act may violate equal protection solely because of the motivations of the man who voted for it.") To trigger close judicial scrutiny of a legislative enactment, the plaintiffs must first identify the fundamental right the statute infringes upon. They have not done so here. Therefore the plaintiffs' Due Process claim is dismissed.

■ The plaintiffs have also asserted a Thirteenth Amendment claim. That amendment reads: "Neither slavery nor involuntary servitude ... shall exist within the United States ..." The core of litigation under this statute has been challenges to practices that amount to involuntary servitude. *See, e.g., Hurtado v. United States*, 410 U.S. 578, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1973) (incarceration of witness for want of security of his appearance and payment of $1 a day as a witness fee is not involuntary servitude); *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877 (1921) (state statute penalizing lessor's intentional failure to furnish tenant water or heat did not amount to involuntary servitude); *United States v. Wright*, 474 F.2d 853 (9th Cir.), *cert. denied* 414 U.S. 870, 94 S.Ct. 86, 38 L.Ed.2d 88 (1973) (requiring work of national import in lieu of military service is constitutional); *Bertelsen v. Cooney*, 213 F.2d 275 (5th Cir.), *aff'd*, 348 U.S. 890, 75 S.Ct. 205, 99 L.Ed. 699 (1954) (special draft registration of doctors); *NLRB v. Wine, Liquor & Distillery Workers Union, et al.*, 178 F.2d 584 (2nd Cir.1949) (statute proscribing secondary boycott as an unfair labor practice in constitutional); *Freeman v. Freeman*, 397 A.2d 554 (D.C.1979) (ordering the parent to pay child support and to seek gainful employment does not violate the Constitution);

The Thirteenth Amendment has also been used as a tool to eradicate all "incidents and badges of slavery." *Washington v. Finlay*, 664 F.2d 913 (4th Cir.1981), *cert. denied* 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1333 (1982); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Although the debates of the 1902 Constitutional Convention certainly suggest that an appointive system for the selection of school boards was chosen to limit black participation, the protection afforded by the Thirteenth Amendment, however, cannot be interpreted to reach all acts of racial discrimination. The Fourth Circuit's decision in *Washington v. Finlay*, 664 F.2d 913, 927 (4th Cir.1981), gives guidance: "In the realm of voting, we think the thirteenth amendment offers no protections not already provided under the fourteenth or fifteenth amendments." Congress has enacted legislation that not only gives practical effect to the Thirteenth Amendment, but also sets the parameters of the amendment's reach. *See Memphis v. Greene*, 451 U.S. 100, 131–35, 101 S.Ct. 1584, 1602–04, 67 L.Ed.2d 769 (1981) (Justice White, concurring); 42 U.S.C. §§ 1981, 1982. With no precedent to guide it and no need to break new ground in this area, the Court holds that the Thirteenth Amendment does not reach the actions complained of here. The Fifteenth Amendment, the Voting Rights Act and the Equal Protection Clause of the Fourteenth Amendment address the issues directly and can provide

adequate protection and relief to the plaintiffs.

To state a cause of action under the Fifteenth Amendment, the plaintiffs must show an outright denial of the ballot by the state with a racially discriminatory motive. The State suggests that since the school board in an appointive system, no right to vote is implicated.

After 1947, however, the school board could have been an elected body. An act of the General Assembly permitted counties that operated under a county manager system and which had abolished magisterial districts to elect its school board. *Acts,* 1947, Chap. 61 (Jan. 30, 1947), 113–116 (adding new sections Va.Code §§ 22–84— 22–88.1) Although only Arlington County qualified at the time, the law was enacted as a general law.[2] Over the course of time and demographic changes, every county in the state may have qualified under the law. In 1956, the General Assembly repealed this grant of the ballot. The Court judicially notes that the repeal followed closely after the Supreme Court handed down *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and the plaintiffs have submitted evidence that the repeal was motivated in part to ensure that blacks would not become influential on school boards. In 1956, then, the Fifteenth Amendment was an appropriate means for attacking the new legislation. Thirty years later, the burden rests with the plaintiffs to demonstrate that they are currently harmed by the decision in 1956 to return to an appointive system and that the harm warrants the remedy they seek.

Notwithstanding the 1947 act and its repeal in 1956, the Fifteenth Amendment is also the appropriate means by which to challenge the appointive system given the peculiar character of school boards. They are not purely administrative bodies. Whether appointive or elected, they are politically suffused. The actions of the school board are the subject of constant debate among citizens. It is the the body charged with maintaining the type of schools people want at a price people are willing to pay. Thus, it is nearly impossible for the school board to escape from its political aura. As further evidence of its political nature, every other state in the country permits some form of elective school boards.

The Voting Rights Act of 1965, 42 U.S.C. § 1973 (1986) also provides plaintiffs a cause of action. Under § 2 of the Voting Rights Act, a plaintiff must demonstrate that the proscription of a "voting qualification or prerequisite to voting or standard, practice or procedure ... which results in a denial or abridgment of the right of any citizen ... to vote" was motivated by race. Furthermore, "a violation ... is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivisions are not equally open to participation by members of a class or citizens ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973.

■ The plaintiffs claim that the statutory scheme of selection, a "practice or procedure," replaced in 1956 their right to vote for school board members for racially discriminatory reasons. The effect of this practice, assert the plaintiffs, is to deny them the opportunity to equally participate in the political process. Therefore, the plaintiffs have stated a prima facie case. However, even if the 1956 General Assembly's act of repealing the possibility of electing school board members is interpreted to be a denial of the right to vote, there is still a problem of retroactivity.

■ The Voting Rights Act was enacted in 1965. The General Assembly repealed the right to vote for school boards in 1956. There is nothing in the statute's plain language, legislative history, or judicial construction to suggest that the Act is retroactive. Since there has not been any similar denial since 1956, the states' argument that the Voting Rights Act cannot apply because there has been no denial of the right

---

**2.** *See,* Acts, 1947, Chap. 41, (Jan. 30, 1947) 91–93.

to vote seems persuasive at first blush. The Voting Rights Act's remedial purpose requires that the Court inquire further into the State's practice. The Act is designed to ensure minority voters, who have historically been victims of purposeful discrimination, an effective right to political participation. S.Rep. No. 97–417, 97th Cong., 2d Sess. (1982), reprinted in 1982 U.S.Code Cong. and Ad.News 177. The plaintiffs allege that Virginia enacted and has maintained an appointive system in order to diminish black participation in the school board process. If the selection process was elective, federal statutes and constitutional provisions regulating state behavior would surely govern. Since the process is appointive, argues the State, the federal statutes do not govern. The Voting Rights Act, however, seeks to purge the political process of all means employed to diminish minority voting power, specifically including "shifts from elective to appointive office." H.Rep. 97–227, 97th Cong., 2d Sess. 18 (1982). Although the shift from potentially electing school board members to appointing them occurred before the passage of the Act, the effects, if any, of that decision are felt each time a school board is selected.

To hold, as the State requests, that the Voting Rights Act applies only to instances where a state chooses to hold elections but does not apply where the state purportedly rejects elections in favor of a discriminatory appointive system would unnecessarily narrow the limits of the Voting Rights Act. To be fully effective, the Voting Rights Act must reach all state behavior designed to limit participation in the political process because of a person's skin color.

Arguably such an expansive reading of the Voting Rights Act threatens to encroach on areas reserved to the states by the Constitution. The Supreme Court, in considering the constitutionality of the Act, wrote:

As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional

prohibition of racial discrimination in voting.

.    .    .    .    .

The gist of the matter is that the Fifteenth Amendment supercedes contrary exertions of state power. "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Gomillion v. Lightfoot,* 364 U.S. at 347 [81 S.Ct. at 130], 5 L.Ed.2d at 117. *South Carolina v. Katzenbach,* 383 U.S. 301, 324–25, 86 S.Ct. 803, 816–17, 15 L.Ed. 2d 769 (1966). Therefore, the Voting Rights Act does not necessarily reach a state's decision to make an office appointive or elective, but does reach such action where an appointive system is selected over an elective system for the purpose of excluding blacks from the political process. Although Virginia made this alleged decision prior to the enactment of the Voting Rights Act, the plaintiffs can still state a claim under the Act to the extent that the effects of that decision are currently felt by the black population.

Similarly, the plaintiffs have stated a claim under the Equal Protection clause of the Fourteenth Amendment and have presented evidence sufficient to withstand the defendants' motion for summary judgment. The Equal Protection clause mandates that "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." Although the plaintiffs do not have a constitutional right to be appointed to local school boards, they do have a right to be considered for public service on an equal basis with whites. They claim that the appointive system cannot give them an equal opportunity for appointment because of its original discriminatory purpose.

The plaintiffs assert that they need only demonstrate that the appointive system was originally enacted in 1904 and reinstated in 1956 to deprive blacks of equal participation in the school board selection process in order to prevail on their Fifteenth

Amendment, Voting Rights Act, and Equal Protection clause claims. This argument fails for several reasons. First, as noted earlier, conclusive evidence of the original drafters' intent and the 1956 legislators' motivation is not properly before the Court for purposes of summary judgment. The testimony of experts on their interpretation of events and sources for their opinions can be heard at trial. To accept the facts as set forth in the expert's affidavit would exceed the Court's power of judicial notice and force the Court to decide issues of material fact which the defendants contest, a task forbidden by Rule 56, Fed.R.Civ.P., on summary judgment motions.

Second, even if the Court accepted the facts as set forth by the plaintiffs' expert as true, the events complained of happened long ago. The plaintiffs complain of current harm, and therefore must demonstrate current acts that work to deprive them of equal participation in the school board selection process. The Fifteenth Amendment's and the Voting Rights Act's prohibitions on racially motivated denials of the ballot speak of current discrimination, not past acts of discrimination. Hence it is incumbent upon the plaintiffs to demonstrate that the appointive system, allegedly conceived and maintained for the purpose of limiting black participation, currently succeeds in its original goal.

In *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), the Supreme Court implicitly ruled that even where there is clear legislative history that a statute was passed with discriminatory intent, plaintiffs must demonstrate disparate impact as well. In *Hunter*, the plaintiffs challenged an Alabama law which disenfranchised citizens convicted of "any crime ... involving moral turpitude." At trial, the plaintiffs demonstrated that when enacted in 1901, the law was intended to have a disproportionate impact upon blacks. The plaintiffs also proved that the statute continued to currently have that effect. In striking down the law, the Supreme Court noted that the statute's "original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such it violates the [Constitution] ..." *Id.*, 471 U.S. 'at 233, 105 S.Ct. at 1922. *See also, Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977) upon which the decision in *Hunter* rests.

Similarly, in *Searcy v. Williams*, 656 F.2d 1003 (5th Cir.1981) *aff'd sub nom, Hightower v. Searcy*, 455 U.S. 984, 102 S.Ct. 1605, 71 L.Ed.2d 844 (1982), where the plaintiffs also challenged an appointive school board selection process on Fourteenth and Fifteenth Amendment grounds, the Court struck down a statute conceived with discriminatory intent because of its present discriminatory effect against blacks:

> [T]he tainted origin of the school board has been carried forward to the present day by the self-perpetuating method of selection to the Board. Regardless of whether the school board selection scheme was purposefully conceived to further discrimination, however, the system has clearly operated purposefully to further discrimination. We hold, therefore, that this unique system for selection of the school board that was operated in discriminatory manner, together with the self-perpetuation of the Board of Education ... is violative of the appellants' rights under the Fourteenth Amendment.

Id. at 1010. (footnote omitted).

The role of original intent and current effects is slightly more complicated under the Fourteenth Amendment's analysis. If the plaintiffs demonstrate that the appointive system was originally created and maintained with the intent of depriving blacks of meaningful input into the school board selection process, the burden of proof switches to the State and counties to demonstrate that the current system has not been perpetuated to intentionally discriminate against blacks. *See, Hunter v. Underwood*, 471 U.S. 222, 228, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985) ("Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to

all the law's defenders to demonstrate that the law would have been enacted without this factor."); *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The issue before this Court is not so much the original intent of the statutory scheme but its continuing effects today. Consequently, the analysis presented in *Keyes* is more applicable. In *Keyes*, the plaintiffs challenged a Denver school de-segregation plan. The Court stated, "There are no hard-and-fast standards governing the allocation of the burden of proof in every situation. The issue, rather, 'is merely a question of policy and fairness based on experience in the different situations.' 9 J. Wigmore, Evidence § 2486 at 275 (3rd Ed.1940)." 413 U.S. at 209, 93 S.Ct. at 2698. The plaintiffs in *Keyes*, as in the instant case, alleged that there was an uncontested pattern of past intentional discrimination.[3] The Court in *Keyes* held "that a [prior] finding of intentional segregative school board actions in a meaningful portion of a school system ... establishes ... a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions." *Id.* at 208, 93 S.Ct. at 2697. A similar shift of the burden of persuasion seems appropriate here. If the plaintiffs succeed in demonstrating that the appointive scheme was conceived and maintained in the past with the intent of discriminating against blacks, the state should bear the burden of demonstrating that the scheme is not currently being perpetuated for this purpose.

Virginia has offered evidence to meet this burden of persuasion. It argues that the State Constitution of 1971 repudiated the Constitution of 1902 and its constitutional debates and signaled the dawn of a new era in Virginia, an era which, among other things, renounced the policies of massive resistance. Also as part of the ratification process, the Code of Virginia was re-enacted and re-numbered. This process, argues the State, created a new organic law purged of the racist taint of the 1902 Constitutional Convention. The State has failed to demonstrate, however, that these acts in and of themselves are causally related to the appointment scheme. In passing the new state constitution, the state did not address directly the issue of appointive school boards or the policies of massive resistance. Nor did the re-enactment of the Code, little more than a paper act, confront the issue of school board selection. Similarly, the enactment of a plethora of civil rights legislation in the last eighteen years, such as the Fair Housing Act of 1972, is but circumstantial evidence of the difference in attitudes of the Virginia of 1988 and that of 1956 and 1902. More probative of the issues involved are the bills that have been introduced since 1971 and the legislative reports they have generated.[4] But this evidence alone is insufficient to carry the State's burden of proof.

The most important indicia of the lack of discriminatory intent in the appointive scheme, according to the State, is the fact that black representation on Virginia's school boards is directly proportional to number of blacks that comprise Virginia's

---

**3.** In *Keyes*, the Supreme Court had previously made a finding that the school district's prior plan was intentionally discriminatory. The plaintiffs note that in the instant case, the Supreme Court has previously determined that the purpose of the Virginia Constitutional Convention of 1902 was "the desire to disenfranchise the Negro." *Harman v. Forssenius*, 380 U.S. 528, 543, 85 S.Ct. 1177, 1186, 14 L.Ed.2d 50 (1965).

**4.** The General Assembly has considered bills to change the selection process in 1973 (H.B. 1385 and H.B. 1082, dealing only with Arlington County), 1974 (H.B. 481, H.B. 615 and H.B. 1028); 1976 (H.B. 29, H.B. 38, H.B. 495, S.B. 37,

and S.B. 38); 1977 (H.B. 2059), 1978 (H.B. 112, H.B. 300, H.B. 749, H.B. 1085, H.B. 1583, H.B. 1709, and S.B. 263), 1979 (H.B. 640, H.B. 1583, H.B. 1709, and H.B. 1805), 1980 (H.B. 147, H.B. 269, H.B. 366, and H.B. 841), 1982 (H.B. 534 and H.B. 633), 1983 (H.B. 112), 1984 (H.B. 105, H.B. 480, and H.B. 593), 1985 (H.B. 1015, H.B. 1342, H.B. 1344, and H.B. 1716), and in 1986 (H.B. 123 and H.B. 191). The General Assembly has also commissioned two legislative studies to review whether some or all school board members should be popularly elected. H.Res. No. 12, 1984 Va.Acts 2270; S.J.Res. No. 135, 1979 Va.Acts 1380.

voting population. Eighteen percent (18%) of Virginia's voting population is black and blacks comprise eighteen percent of the school board membership statewide.[5] Moreover, Virginia has the highest percentage of blacks on school boards than any other state. (Statistics of the National School Boards Association, 1986–87). The State contends that this survey is undisputed proof that there is no statewide pattern of discrimination against blacks on Virginia school boards. This proportionality, however, in and of itself, is not enough. It may well be the product of the natural progression of time. To carry its burden of persuasion, the State must demonstrate present evidence of its affirmative acts to purge itself of the statutes' discriminatory taint. *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).

Moreover, the eighteen percent figure is somewhat misleading when voting populations and school board compositions are compared on a county by county and city by city comparison. The parties' surveys reveal that the correlation between voting population and school board composition turns upon the means by which school board members are selected. The Virginia statutory scheme basically permits two means of selecting school boards. Either the elected governing body such as the Board of Supervisors or City Council selects school board members (Va.Code §§ 15.1–609, 15.1–644, 15.1–708, 15.1–770, and 22.1–50) or the chief circuit judge of the county appoints a selection commission which in turns appoints the school board members. (Va.Code § 22.1–35)

The parties have examined each school board district in the State, and have compared the racial composition of each school board with the composition of the county's or city's voting population. The parties

agree that in 27 to 30 counties blacks are "underrepresented"—the percentage of blacks in the division's population as a whole is greater than the percentage of blacks on the division's school board.[6] At the time the survey was taken, forty-seven (47) local school boards were appointed by selection commissions. (Ninety (90) were appointed by the local governing body.) (Aff. of Vicki Crews Behr, Assist. Executive Director of Virginia School Boards Association, at 2) In these forty-seven counties, blacks are under represented on the school boards in eighteen instances, and in seventeen of these eighteen counties, blacks comprised fifteen percent or more of the voting population. In only two—Pulaski and Spotsylvania counties—are blacks "overrepresented," according to the State's survey, on the school board. That a selection process used in only a third of the school board divisions should produce over half the instances where blacks are "underrepresented" is unusual. The correlation suggests that the selection commission process may work a disparate impact upon blacks. "Statistical analyses have served and will continue to serve an important role as one indirect indicator of racial discrimination in access to service on governmental bodies ..." *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974). Moreover, if upon further analysis the plaintiffs can present more evidence of the correlation between the method of selection employed and underrepresentation of blacks on the school board, the Court may infer "fatal discriminatory purpose ... from the overwhelming convincing statistical evidence of unexplained disparity." *Searcy v. Williams*, 656 F.2d 1003 (5th Cir.1981), *aff'd sub nom. Hightower v. Searcy*, 455 U.S. 984, 102 S.Ct. 1605, 71 L.Ed. 2d 844 (1982). *See also, Castaneda v. Partida*, 430 U.S. 482, 494–498, 97 S.Ct. 1272,

---

5. The composition of school boards is derived from information by the Virginia School Board Association and figures representing the racial composition of the voting populace were taken from United States Census Bureau, *Country and City Data Book*, Tables B and C (1983) and *Black Elected Officials: A National Roster* 409 (16th ed. 1987).

6. The defendants count as underrepresented counties and cities where the disparity between voting population and school board composition is ten percentage points or greater. The plaintiffs apparently take the view that where the addition of one black to the school board would narrow the disparity, the county or city is underrepresented.

1280–1282, 51 L.Ed.2d 498 (1977); *Turner v. Fouche*, 396 U.S. 346, 359–361, 90 S.Ct. 532, 539–541, 24 L.Ed.2d 567 (1970).

Although Surry County is not a named plaintiff in this action, its experience is illustrative of the possible effect on blacks of the school board selection commission process. In November of 1971, blacks won three of the five seats on the county Board of Supervisors of Surry County. The school board remained appointed by a selection commission, and whites retained a three to two majority, despite a black voting majority, a black majority on the Board of Supervisors, and an almost entirely black student population. An attempt to shift the selection process from an electoral commission to the Board of Supervisors was defeated in May of 1972. (Aff. of Thomas Hardy, resident of Surry County) But Surry's experience also lends credence to Virginia's claim that the State has entered a new era free of racial discrimination in the political process. For in 1987, Surry held another referendum on the school board selection issue, and the referendum passed. (Aff. of Thomas Hardy) The next vacancy will be filled by the Board of Supervisors.

The State argues that the effect of a statute in several counties is of no significance, even if the plaintiffs can prove disparate impact. The plaintiffs' challenge is statewide, and, according to the State, the nondiscriminatory administration of the statutes statewide, as reflected in the eighteen percent proportionality between voting population and school board membership, is an absolute defense to constitutional challenges of the statutes. Virginia suggests that according to *Louisiana v. United States*, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965), the challenged statutes should be invalidated only if they are applied in a discriminatory manner in every place and have a discriminatory effect in every place they are applied.

However, in *Louisiana v. United States*, the Supreme Court struck down the challenged statutes "as written and as applied." 380 U.S. at 151, 85 S.Ct. at 821. Here the statutes are neutral on their face.

Proof of the State's past intentions to discriminate will be insufficient for the plaintiffs to prevail. Hence, the plaintiffs must demonstrate that the statutes as applied disproportionately effect blacks on a magnitude sufficient to create an inference of intentional discrimination. This does not mean that the plaintiffs must show statewide impact or that they must demonstrate a pattern of discriminatory effects under each system of appointment. The plaintiffs may only be able to demonstrate that only one method of school board appointment results in a pattern of discrimination in a few counties. A constitutional violation would exist even if such violations are not on a statewide scale. Hence, the State confuses the plaintiffs' ability to prove a constitutional violation and the Court's role in fashioning an appropriate remedy. If the plaintiffs succeed in demonstrating constitutional violations in selected counties, then the Court in its equitable powers will fashion the appropriate remedy, which may or may not entail invalidating Virginia's statutes.

■ The central issue in this matter is does Virginia's use of an appointive scheme continue to deny blacks equal access to participation in the selection of school board members as the scheme was apparently intended. The State has offered evidence that the appointive scheme is maintained for non-racial reasons; that the State has aggressively sought to rid itself and society of past vestiges of racial discrimination; and that the appointive scheme has in fact secured blacks the highest rate of participation on school boards of any state in the county.

The plaintiffs, on the other hand, contend that the system was created and maintained, at least through the period of massive resistance, to purposely exclude blacks from the school board selection process, and the statutes succeed in fulfilling that goal to this day.

The Court cannot reconcile on cross motions for summary judgment these two diametrically different characterizations of the statutes. The record is incomplete. The plaintiffs cannot rest their case on acts

that occurred eighty-five and thirty years ago. They must offer proof of current intentional acts to impede blacks' opportunity to participate equally in the school board selection process. This evidence may include statistical data demonstrating the current scheme's disproportionate impact upon blacks, an impact sufficient from which to draw an inference of intent. Similarly, the State cannot rest on its argument that time has removed the taint of racial prejudice attached to the appointment scheme. It must show that the affirmative acts it has taken are causally related to the apparently racially neutral school board selection process as suggested by the eighteen percent participation figure. Moreover, it cannot rely on a "statewide approach" to defeat inferences of intentional discrimination in those instances where plaintiffs demonstrate that the statutes have a disproportionate impact upon blacks.

The plaintiffs' Fifteenth Amendment, Voting Rights Act, and Fourteenth Amendment's Equal Protection Clause claims survive the motions for summary judgment. The plaintiffs have the burden of proving by a preponderance of the evidence the State's discriminatory intent in denying blacks the right to equal participation in the school board selection process in violation of the Fifteenth Amendment. Under their Voting Rights Act claim, the plaintiffs also have the ultimate burden of proof and can carry this burden by either demonstrating "intent" or "effects" as defined in the amended Act. 42 U.S.C. 1973(b). Under the Fourteenth Amendment's Equal Protection analysis, the plaintiffs' initially have the burden of proof. But if they can establish a past pattern of intentional discrimination, the State will bear the burden of proving that the statutes and procedures required by them are racially neutral. To rebut this showing, the plaintiffs will have to present the same evidence needed to carry their claims under the Fifteenth Amendment and Voting Rights Act.