Darius IRBY, et al.

v.

Susan H. FITZ–HUGH, et al.

Civ. A. No. 87–0633–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 18, 1988.

Gerald T. Zerkin, Gerald T. Zerkin & Associates, Susan L. Quig–Terry, American Civil Liberties Union Foundation of Virginia, Richmond, Va., Kathleen L. Wilde, Laughlin McDonald, Neil Bradley, Derek Alpharan, American Civil Liberties Union Foundation, Inc., Atlanta, Ga., for plaintiffs.

Guy W. Horsley, Jr., Mary Sue Terry, Gail S. Marshall, K. Marshall Cook, Paul J. Forch, Gregory J. Haley, Joan Murphy, Office of the Attorney General, Richmond, Va., for Fitz–Hugh, in her official capacity as Secretary of the Virginia State Bd. of Elections, and Virginia State Board of Elections.

Mayo K. Gravatt, Blackstone, Va., for Long, Daniels, Eppes, Jenkins, and Hagaman, in their official capacities as members of the School Bd. Selection Com'n of Nottoway County, and Powell, King and Ragland, in their official capacities as members of the Electoral Bd. of Nottoway County.

E.M. Wright, Jr., Buckingham, Va., for Agee, La Sueur, and Morris, in their official capacities as members of the School Bd. Selection Com'n of Buckingham County, and Shepard, Morgan, and Steger, in their official capacities as members of the Electoral Bd. of Buckingham County.

Robert A. Bruce, Farmville, Va., for Carwile, Clark, Garnett, Hendley, Maxwell, Moore, Scott, and Stokes, in their official capacities as members of the Board of Supervisors of Prince Edward County, and Watson, Ferguson, and Venable, in their official capacities as members of the Electoral Bd. of Prince Edward County.

William W. Bennett, Jr., Bennett and Rand, Hailfax, Va., for Tate, Conner, Abbott, Clark, Colman, Henderson, and Matthews, in their official capacities as members of the Board of Supervisors of Halifax County, and Woltz, Conner, and Farrington, in their official capacities as members of the Electoral Bd. of Halifax County.

Michael R. Packer, Office of the City Atty., Petersburg, Va., for Farley, Edwards, Bigley, Cuthbert, Mickens, West, and East, in their official capacities as members of the City Council of the City of Petersburg, and Aldridge, King, and Phillips, in their official capacities as members of the Electoral Bd. of the City of Petersburg.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD L. WILLIAMS, District Judge.

This matter came before the Court for a trial to the bench. After hearing the evidence presented at trial, reviewing the stipulations, considering the exhibits and depositions submitted, and having benefited from the closing arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

## FINDINGS OF FACT

1. Plaintiffs Darius Irby and John S. Neal are black citizens and registered voters of the Commonwealth of Virginia and residents of Nottoway County.

2. Plaintiff Charles W. White is a black citizen and registered voter of the Commonwealth of Virginia and a resident of Buckingham County.

3. Plaintiff the Reverend James Samuel Williams, Jr. is a black citizen and reg-

istered voter of the Commonwealth of Virginia and a resident of Prince Edward County.

4. Plaintiff Cora Tucker is a black citizen and registered voter of the Commonwealth of Virginia and a resident of Halifax County.

5. Plaintiffs Willie Powell and Milton Richardson are black citizens and registered voters of the Commonwealth of Virginia and residents of the City of Petersburg.

6. Plaintiff Virginia Unit of the Southern Christian Leadership Conference ("SCLC") is a non-profit grassroots organization of more than one thousand persons dedicated to protecting and advancing civil rights. The Virginia Unit of the SCLC claims its membership is harmed by Virginia's appointive procedure.

7. Plaintiff Citizen for a Better America is a non-profit grassroots civil rights association, organized in Halifax County. It has worked for the past twelve years to promote civil rights in Virginia and claims its members are harmed by Virginia's system of appointing school board members.

8. The concentration of black citizens in Virginia's various counties varies from county to county as does the alleged amount of "underrepresentation" on school boards. "Underrepresentation" of blacks on local school boards is defined to be that situation where blacks, by virtue of their percentage of the local population, would be expected to have one or more additional black school board members. Consequently, the harm, if any, suffered by the plaintiffs and the class they seek to represent varies from district to district. There is no typical plaintiff.

9. Defendants include the members of the School Board Selection Commissions ("SBSC") of Nottoway and Buckingham Counties, the two defendant jurisdictions which select school board members by this method.

10. Also named as defendants are the members of the Board of Supervisors of Prince Edward and Halifax Counties who are responsible for appointing school board members in their respective jurisdictions and members of the City Council of Petersburg who are charged with appointing school board members for that jurisdiction.

11. The third category of defendants consists of the members of the Electoral Boards of each of the named jurisdictions and Susan H. Fitz–Hugh, Secretary of State Board of Elections, who were named as necessary parties for purposes of fashioning possible relief.

12. In each of the named defendant jurisdictions, the level of black participation differs. Hence, the racially discriminatory effects, if any, of the appointive scheme are unique to each jurisdiction. Also, the details of the appointment process—who participates and to what extent, how nominations are received or solicited, and any development of formalized procedure—are all determined autonomously at the local level. For example, in Petersburg, the city maintains a "Talent Bank" of interested citizens. The appointing board generally limits its consideration of potential board appointees to those persons who have submitted their names to the Talent Bank. The City of Charlottesville, not a defendant, mails copies of its announcement for openings to the ministers of the seven predominantly black churches in the city, the president of all the neighborhood associations in Charlottesville, and to the president of the N.A.A.C.P. Consequently, there is no typical defendant jurisdiction.

13. There are one hundred thirty-six school districts in Virginia, and school boards in these districts are appointed in one of four ways. Under Va.Code § 22.1–34 et seq., the school board is appointed by a three person school board selection commission which is in turn appointed by the local circuit court judge. Nottoway and Buckingham Counties use this system of appointment. Counties which do not have either a County Executive, County Manager, County Board or Urban County Manager form of government are included in § 22.1–34. Under a 1970 amendment, Va.Code § 22.1–41, et seq., Nottoway, Buckingham and similarly situated counties can hold a referendum to

transfer the appointment power from the non-elected school board selection commission to the governing body.

14. Under the second means, Va.Code §§ 15.1–609 (County Executive), 15.1–644 (County Manager), 15.1–708 (County Board), or 15.1–770 (Urban County Manager), the county board of supervisors appoints members of the school board. Prince Edward and Halifax counties employ this system. In cities and towns, such as Petersburg, the governing body appoints the school board. Va.Code § 22.1–50. In three school districts in Virginia, none of which are a party to this litigation, the county board of supervisors and the city's city council appoint the school board where the school district overlaps the city and county boundaries, Va. Code § 22.1–53.

15. The Public Free School Law, passed July 11, 1870, provided for the appointment of "school trustees" by the State Board of Education. *Acts of the General Assembly of Virginia,* 1869–70, Chapter 259, (July 11, 1870), 408–09. (Hereinafter "Acts") The three school trustees appointed in each district had duties similar to modern school boards. There is no evidence, direct or circumstantial, that the original decision to make school boards appointive rather than elective was motivated by racial discrimination. The decision was made in the era of Reconstruction. Concerted efforts to exclude blacks from the political process in Virginia did not begin until 1874–1875. (Testimony and Affidavit of Peyton McCrary.)

16. Even modifications made to the appointive scheme at a time when Democrats were enacting other laws designed to limit black participation in Virginia politics send a mixed message. When conservatives came to power in 1877, they transferred the appointment power from the state school board to local school trustee electoral boards comprised of the county superintendent of schools, the county judge and the attorney for the Commonwealth. *Acts,* 1876–77, Ch. 12, (Jan. 11, 1877), 9–10. The effect of this action was racially neutral. In counties with Readjuster or Republican judges, commonwealth attorneys, or school superintendents, the local trustee electoral boards named board members sympathetic to black education, and in black majority counties, they named blacks as school trustees. (Testimony of Peyton McCrary).

17. In 1884, the appointive scheme was again modified to provide for the appointment of members to school trustees electoral commissions by the General Assembly. *Acts* (1883–84), Ch. 138, (Feb. 20, 1884), 177–78. Again the discriminatory intent of this change is unclear. Historians disagree as to whether this change was racially motivated. (See testimony of Peyton McCrary and Peter Stewart). Moreover, although the legislation was enacted by a conservative minded General Assembly, Readjuster Governor William E. Cameron, a member of a party committed to blacks' rights, approved the legislation. Finally, even if racially motivated, the modification was short-lived. The power to appoint was restored to local county officials in 1887. *Acts,* (Extra Sess., 1887), Ch. 233, (May 14, 1887), 305–06. Between 1887 and 1901, however, no blacks were appointed as school board members. (Testimony of Peyton McCrary).

18. By the time of the Virginia Constitutional Convention of 1901–02, the scheme for appointing the selection commission for the subsequent selection of school trustees was well established. During the course of the convention, the education commission proposed changing the means of selection to make school trustees elective offices. *Report of the Proceedings and Debates of the Constitutional Convention,* State of Virginia, 1901–02, 1828 (1928). The proposed change to the existing scheme was defeated in part for racial reasons. Mr. J.B.T. Thornton, a member of the Committee on Education, opposed the change on the grounds that blacks may be elected, "a condition of affairs" that he found "abhorrent." *Debates,* at 1829. His comments were echoed by another, Mr. Eggleston. *Id.* The convention chose to leave the appointive scheme intact, aside from a few minor changes. The predominate intent of the 1901–02 convention, however, was not the disenfranchisement of blacks, but the

disenfranchisement of the impoverished. This intention surfaced in the discussion of the school board amendment. Mr. Summer commented:

Now gentlemen, come forward like men and vote your sentiments and say that the poor white man and the negro [sic] shall have no rights in Virginia, so that they may emigrate to a richer and more fertile and liberty-loving soil.

*Debates* at 1830. The intent, therefore, was to reduce poor whites and blacks to the status of women—disenfranchised.

19. The amendment to change the method of selection was defeated, and in 1903 the General Assembly preserved the appointive scheme but replaced the circuit court judge's position on the school trustee electoral commission with a private citizen appointed by the circuit court judge. *Acts,* (Extra Session 1902–04), Ch. 509, (Dec. 28, 1903), 806–812, §§ 1450, *et seq.,* City and towns continued to appoint their own school trustees. *Acts,* (1902–04), Ch. 512, (Dec. 31, 1903), 825–28, § 1522 et seq.

20. Significantly, the General Assembly did not adopt an elective school board scheme after purifying the electorate of those the Convention felt to be undesirable. Such a well timed switch would have extinguished some legislators' fears that a few school trustee electoral commissioners may be sensitive to black educational needs. The evidence suggests, however, that the political machine, spawned by the purified electorate, successfully controlled the county school trustee board so as to make an elective system unnecessary in order to exclude blacks from the process.

21. Although three separate studies recommended that Virginia elect its school board members, the General Assembly resisted such advice and modified the existing structure. In 1926, the composition of the electoral commission was changed to three citizens all appointed by the local circuit judge, *Acts* (1926), Ch. 106, (March 6, 1926), 104, and changed again in the 1930's to allow for counties with county manager or county executive forms of government to have the school board appointed by the Board of Supervisors.

22. In 1947, the General Assembly departed from the appointive scheme and passed a general law which permitted "any county operating under the county manager plan ... and in which county magisterial districts have been abolished ..." to elect its school board members if a majority approved this change by referendum. *Acts* (1947), Chap. 61 (Jan. 30, 1947), 113–16. Only Arlington County qualified under this provision. After voters approved the change, a five-person school board was thereafter elected at large in non-partisan elections until 1956. Arlington never elected a black to serve on the school board during this period.

23. In 1956, following a lawsuit by the N.A.A.C.P., Arlington agreed to desegregate its school system in compliance with *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Shortly thereafter, the General Assembly abolished Arlington's elective system as part of a program of "massive resistance" to court-ordered school desegregation. *Acts* (1956), Chap. 591, (March 31, 1956), 949–50 ("[N]o school board shall be elected by popular vote in and for any county or city."). Arlington's Board of Supervisors appointed members to the school board thereafter.

24. In 1968–69, Virginia created a Constitutional Revision Commission dedicated to restoring order to the mayhem wreaked upon the state's educational system by its policy of massive resistance. The Commission drafted a new constitution which was approved of by two successive General Assemblies. The 1971 Constitution provides in Article VIII, § 1: "The General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained." Furthermore, in § 2, Article VIII mandates that "The General Assembly shall determine the manner in which funds are to be provided for the cost of maintaining an educational program meeting the prescribed standards of quality, and shall pro-

vide for the apportionment of the cost of such program between the Commonwealth and the local units of government comprising such school divisions." The language in § 2 places a legal responsibility on both the locality and State to provide funds for schools. In effect then, the 1971 Constitution eliminates the discretion previously enjoyed by localities to close schools, to cut off funding, and to take other retributive measures against blacks through the educational system.

25. The members of the Commission—Albertis S. Harrison, Jr., Albert V. Bryan, Jr., George Cochran, Ted Dalton, Lewis F. Powell, Colgate Darden, Hardy Cross Dillard, Alexander Harman, Jr., Oliver W. Hill, J. Sloan Kuykendall, and Davis Paschall—rid the State's educational system of the racial overtones and prejudices that previously consumed it. The decision to preserve to the legislature the authority to determine how school board members should be selected was not a racial issue. The members of the Commission were familiar with the 1901–02 Constitutional Convention debates on school board selection. (Testimony of A.E. Dick Howard). A reformation of the selection process was not a piece of the puzzle necessary for putting together a educational system dedicated to guaranteeing all children a quality education, and the Commission did not make changes it felt were unnecessary because it wished to avoid creating centers of opposition to ratification of the constitution.

26. Moreover, in debates among members of the General Assembly considering ratification of the constitution, there is no evidence that the means of selecting school boards was tainted by racial considerations. Members simply could not agree on which method was the best and put the debate off to another day by agreeing to preserve the flexibility that currently existed.

27. There was no discriminatory purpose in the consideration and adoption of the 1971 Constitution of Virginia. To the contrary, the Constitutional Revision Commission and the constitution it produced worked to destroy the tools with which localities were able to racially discriminate through the public schools.

28. The selection system has also been modified since 1970. In 1970, counties that use school board election commissions (Va. Code § 22.1–34) were granted authority to change to a system, if the populace voting by referendum agreed, where the elected governing body appoints the school board members. Va.Code § 22.1–41, et seq., Acts (1970), Ch. 126, 1976. In 1971, the General Assembly authorized all counties to create at-large school board seats. The evidence at trial suggested that these seats are often occupied by black members of school boards. The General Assembly also added in 1980 a provision that allows a county to return to the use of using school board election commissions. Va.Code § 22.1–45. A 1985 amendment requires that a public hearing be held "to receive the views of citizens within the school division" on school board members who may be appointed by the county Board of Supervisors, Va.Code § 22.1–29.1 (1985), and a 1987 amendment prohibits the appointment of anyone to the school board whose name had not been considered at a public hearing. Acts (1987), Ch. 430, 558.

29. Since 1973, there have been several bills to change school board membership to an elective office.[1] The discussion of these bills has been free from any racial considerations.

---

1. The General Assembly has considered bills to change the selection process in 1973 (H.B. 1385 and H.B. 1802, dealing only with Arlington County), 1974 (S.B. 249, H.B. 481, H.B. 615 and H.B. 1028); 1975 (H.B. 1028 and 1135); 1976 (H.B. 29, H.B. 38, H.B. 495, S.B. 37, and S.B. 38); 1977 (H.B. 2059), 1978 (H.B. 112, H.B. 300, H.B. 517, H.B. 749, H.B. 1085, and S.B. 263), 1979 (S.B. 640, H.B. 752, H.B. 1583, H.B. 1709, and H.B. 1805), 1980 (H.B. 147, H.B. 269, H.B. 366, and H.B. 841), 1982 (H.B. 534, H.B. 633, H.B. 866), 1983 (H.B. 112 and H.B. 722)), 1984 (H.B. 5, H.B. 105, H.B. 480, and H.B. 593), 1985 (H.B. 1015, H.B. 1342, H.B. 1344, H.B. 1649, and H.B. 1716), 1986 (H.B. 123 and H.B. 191), and in 1987 (H.B. 991 and H.B. 1135). (Pl.Exh. 34). The General Assembly has also commissioned two legislative studies to review whether some or all school board members should be popularly elected. H.Res. No. 12, 1984 Va.Acts 2270; S.J.Res. No. 135, 1979 Va.Acts 1380.

30. In 1984, the Subcommittee studying School Board Selection (H.R. 12) released a report discussing the arguments for and against the appointment of members of the school board. The report presents legitimate, non-racial reasons for appointing school board members: highly qualified citizens serve on boards who would not be willing to serve if forced to run for public office, an appointive system engenders experience and continuity, and single issue campaigns are more likely avoided with appointive school boards.

31. Black participation on Virginia's school boards has increased over the last 28 years. There were few blacks on Virginia's school boards in 1970. In 1975 and 1981, blacks composed 12% of all school board members statewide. In 1985, the percentage had risen to 15.9%, and in 1986 and 1987, the percentage of blacks on Virginia's school boards was 18%.

32. The percentage of blacks of voting age in Virginia as compared to all Virginians of voting age is 18%.

33. A comparison of the racial composition of school board membership and the population at large for jurisdictions using the SBSC and appointments by local governing bodies yields the same degree of proportionality. Blacks comprise 17.28% of the population in jurisdictions which appoint school board members through the SBSC, and school boards in these jurisdictions are 17.08% black. Blacks comprise 17.23% of the population in jurisdictions in which the school board is appointed by the local governing body. School boards which employ this method are 18.17% black.

34. In 30 of 137 districts, blacks are "underrepresented." (Pl.Exhs. 3 and 6). Blacks are also "overrepresented" in 21 school districts. (Pl.Exh. 1). "Overrepresentation" is defined to mean that the percentage of blacks on a local school board exceeds the percentage of blacks in the locality's population by more than 10 percentage points. In 8 of these 21 localities, however, the black population is so small that a single black on the school board results in overrepresentation. (Pl.Exh. 1).

35. Even in jurisdictions where blacks constitute 30% or greater of the population, the number of jurisdictions which have school boards that are either demographically reflective of their population or have greater black participation is equal to the number of jurisdictions that are underrepresented. (Compare Pl.Exh. 1 and Pl.Exh. 8).

36. The degree of similarity between the racial composition of the population at large and the composition of the school board is present to a lesser degree in named defendant localities. Buckingham County's population is 42% black, but its school board is only 14.2% black. The population of Halifax County is 40% black but the only 22.2% of its school board members are black. In Nottoway County, blacks compose 37% of the population, and the school board is 20% black. The City of Petersburg's population is 61% black, and the school board is 44.4% black. In Prince Edward County 37% of the population is black, and blacks constitute 25% of the school board.

37. The plaintiffs also claim that there are other limits to their participation in the selection of and participation on local school boards that are not reflected in the statistical evidence. Black citizens and black community organizations have actively campaigned for the selection of representatives of their choice, but black candidates without support in the black community have been appointed to fill school board vacancies. (Testimony of Hermanze Fauntleroy, Charles White (by deposition), Chris Smith).

38. The plaintiffs note in support of this contention that 71.92% of all blacks appointed to school boards are appointed in "limited access jurisdictions," jurisdictions where the school board members are appointed by selection commissions, a local governing body with no black members, or a local governing body where blacks are not represented in numbers proportionate to the demographic composition of the local community.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331, 1343, 1344, 2201 and 2202. This suit is authorized by 42 U.S.C. §§ 1973j(f) and 1983.

2. Pending before this Court are the plaintiffs' motion for certification of plaintiff and defendant classes and the plaintiffs' claims under the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

3. Rule 23(a) of the Federal Rules of Civil Procedure requires that:

(1) the class is so numerous the joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

4. The plaintiffs claim to represent "all black citizens of the Commonwealth of Virginia." Since at the time of the 1980 Census, there were 1,008,665 blacks residing in Virginia, *1980 Census of Population, General Social & Economic Characteristics of Virginia*, pp. 48–21, the numerosity requirement is met.

5. Questions of law and fact pertinent to the named plaintiffs and the class they wish to represent are common only to a limited extent, however. The plaintiffs claim that the statutory scheme requiring the appointment of local school board requiring the appointment of local school board members was enacted and has been maintained for the purpose and with the effect of denying the plaintiffs the right to vote and to participate fully in the political process on account of their race. The analysis of the intent of the General Assembly in choosing an appointive scheme rather than an elective one is common to all plaintiffs, but the effects of that decision are not. In some counties or municipalities where there is a small black population, blacks do not suffer from any meaningful underrepresentation. Similarly, there are a few localities with significant black populations that enjoy equal or greater representation on school boards than the population figures suggest. *See, e.g.*, Charles City County, Greenville, Emporia, and the City of Richmond. Additionally, various means are used on the local level to identify prospective school board members. These local idiosyncrasies may cure the deficiencies, if any, in the statutory scheme as it is applied. The Supreme Court emphasized that plaintiffs seeking class certification must not only show that they have been discriminated against, but must demonstrate "the existence of a class of persons who have suffered the same injury as those individuals." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982). The plaintiffs' allegations here are imprecise. They cannot prove that every black resident has been denied an equal opportunity to participate on school boards because of the way in which the appointive scheme has been applied in every school district in Virginia. They do not allege as much, and cannot prove as much.

6. The plaintiffs can show they share common issues of law and fact with other blacks living in the same county, but they cannot demonstrate this commonality with blacks living in an unnamed jurisdiction. Consequently, the plaintiffs have failed to demonstrate the requisite commonality of issues and typicality of claims necessary for the certification of a class of plaintiffs. The plaintiffs' request for class certification is therefore denied.

7. The request to certify the defendants as a class suffers from similar deficiencies. There are many Virginia counties where blacks do not comprise a significant percentage of the population—*e. g.* Carroll County, Buchanan County, Fredrick County and Highland County. There are other school districts where the plaintiffs cannot claim they are underrepresented. Hence, accounting for all districts where the plaintiffs may claim that the effect of the appointive process results in underrepresentation of blacks, the requested defendant class may suffer from lack of

numerosity. Moreover, the details of the appointive process, such as how nominations are received or solicited, are determined autonomously at the local level. The factual questions concerning the level of participation of blacks in the appointive process and the circumstances of black participation, or lack of it, varies from locality to locality. *See Stastny v. Southern Bell Telephone & Telegraph, Co.*, 628 F.2d 267, 277–78 (4th Cir.1980). Therefore, the plaintiffs' motion for certification of a class of defendants is denied.

8. The United States Constitution does not require that members of local school boards be elected. *See Sailors v. Kent Board of Education*, 387 U.S. 105, 108, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967). An appointive system of selecting political officials does not impose inherent barriers to the service of minority citizens in such offices or the participation of minority citizens in the appointment process. *See Rivera–Rodriquez v. Popular Democratic Party*, 457 U.S. 1, 12, 102 S.Ct. 2194, 2201, 72 L.Ed.2d 628 (1982).

9. The Fourteenth Amendment prohibits intentional invidious racial discrimination. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Although the plaintiffs do not have a constitutional right to be appointed to local school boards, they do have a right to be considered for public service on an equal basis with whites. They claim that the appointive system cannot give them an equal opportunity for appointment because of its original discriminatory purpose. The Court stated in its earlier opinion resolving the parties' cross-motions for summary judgment that if the plaintiffs demonstrated that the appointive system was originally created and maintained with the intent of depriving blacks of a meaningful input into the school board selection process, the burden of proof would switch to the State and counties to prove that the current system has not been perpetuated to intentionally discriminate against blacks. Once proven, it would be incumbent upon the plaintiffs to show that the statutory scheme continues to have a present day discriminatory impact. Memorandum Opinion at 20–28.

10. The plaintiffs' burden under the Fifteenth Amendment is similar. They must demonstrate that the defendants have denied them an opportunity to vote based upon intentional racial discrimination, and, if done so in 1870 or 1902, that the current effects of the school board selection process work to deny them equal access to the political process. *See City of Mobile v. Bolden*, 446 U.S. 55, 65, 100 S.Ct. 1490, 1498–99, 64 L.Ed.2d 47 (1980); *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939).

11. The plaintiffs have failed to demonstrate that racial considerations played a role in the 1870 General Assembly's decision to make school trustees appointive rather than elective offices. Similarly, the evidence does not demonstrate that the appointive scheme was maintained through the last decades of the nineteenth century for racially discriminatory reasons. Although the appointive process switched back and forth between centralization in the General Assembly and appointment by local bodies, these changes in the appointive process are not readily identifiable with a racially discriminatory policy. If centralizing the appointment powers in the General Assembly was to enhance that body's power to discriminate, as the plaintiffs contend, one would have expected Readjuster Governor Cameron to veto such a bill. He did not.

12. Race was a "substantial" or "motivating" factor, *Hunter v. Underwood*, 471 U.S. 222, 228, 105 S.Ct. 1916, 1920, 85 L.Ed. 2d 222 (1985), however, behind the 1901–02 Constitutional Convention's decision to retain an appointive system. Several members of the Convention cast the decision in racial tones, and the plain purpose of the Convention was to disenfranchise as many impoverished people, including most blacks, as the delegates could. *See Harmon v. Forsennius*, 380 U.S. 528, 543, 85 S.Ct. 1177, 1186–87, 14 L.Ed.2d 50 (1968). The appointive system was maintained, therefore for constitutionally impermissible reasons in 1902.

13. The plaintiffs have not proven, however, that the 1903 General Assembly modification and retention of the appointive scheme was done for racially discriminatory reasons. Although the act was passed at a time when a white supremacy movement was sweeping the post-Reconstruction South, there is nothing in the record to suggest that the decision to continue to appoint school trustees was tainted by this racial animus. In fact, if the 1903 General Assembly had changed the selection process to an elective system, it would have completely excluded blacks from school board participation.[2] Blacks had been disenfranchised in 1903. The decision to preserve the appointive system worked no greater evil than changing the system.

14. Similarly, the General Assembly's failure to heed the advice of study groups in the 1920's and 1930's that recommended a change to elected school board members does not rise to a constitutional injury.

15. In 1947, the General Assembly allowed Arlington County to elect its school board. The adoption of a scheme whereby some localities elected and others appointed their school board members is constitutionally permissible. Revocation of that scheme for racially discriminatory reasons is impermissible, however. In 1956, when the General Assembly revoked Arlington County's ability to elect its school board members, the Assembly did so to impede Arlington's ability to comply with court ordered desegregation. This action created a cause of action unique to Arlington. No other county, including the named defendants, was affected by that decision, nor were the named plaintiffs affected by this intentional racially discriminatory act.

16. No evidence in the record suggests that the consideration given various bills which proposed changing to elective school boards has turned upon racial grounds. The 1984 report of the subcommittee studying School Board Selection (H.R. 12) presents legitimate non-discriminatory reasons for the maintenance of appointed school boards.

17. The most the plaintiffs have proven by a preponderance of the evidence is that the 1901–02 Constitutional Convention maintained the appointive system for racially discriminatory reasons. With the exception of Arlington County in 1956, no other acts by the state, county or city defendants suggests that the system has been maintained to limit black participation. Therefore, the plaintiffs have not demonstrated that the appointive system is presently maintained for racially discriminatory reasons.

18. Even if this Court were to find that the appointive system was conceived and maintained until 1971 for the purpose of limiting black participation in the selection of and participation on school boards, the plaintiff's Equal Protection and Fifteenth Amendment claims would still fail. The state has carried its burden of proof in demonstrating that at least since 1971 the system has not been maintained for racially discriminatory reasons. The Constitutional Revision Commission addressed directly the policies of massive resistance and purged them from the educational system. Article VII of the Constitution affirms this commitment. The 1984 legislative study also presents legitimate non-discriminatory reasons for preserving appointive boards.

19. The plaintiffs have failed to prove that the appointive system has adversely affected black participation on either a statewide or local basis in the named defendant localities. Since efforts to purge Virginia's public educational system of racial discrimination began in 1970, black participation on school boards has steadily risen. On a statewide basis, blacks comprised approximately 18% of the voting population and approximately 18% of all school board

---

**2.** Some delegates to 1902 Constitutional Convention, such as J.L. Thornton, apparently endorsed the idea of elective school boards for precisely this reason. Thornton withdrew his support for elected school boards when the convention considered the issue of school boards before deciding the issue of franchise. He stated: "I wish to state that … I voted in committee to elect the school trustees, but I did so with the understanding at the time that the matter would not be passed upon in Convention until the question of franchise had been settled and disposed of." *Debates*, at 1828.

members statewide. This congruency is preserved where school boards are selected by selection commissions and where they are appointed by local governing bodies. Conversely, in *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) and *Searcy v. Williams*, 656 F.2d 1003 (5th Cir.1981), *aff'd sub nom., Hightower v. Searcy*, 455 U.S. 984, 102 S.Ct. 1605, 71 L.Ed.2d 844 (1982), where the courts struck down laws conceived with discriminatory intent, those laws continued to have a present day disparate impact upon blacks. That is not the case here.

20. Because the plaintiffs have failed to demonstrate by a preponderance of the evidence that the system for appointing school board members was conceived or is presently maintained for the purpose of limiting blacks' participation in the selection of school board members and participation on such boards, and have not demonstrated that the law results in a present discriminatory impact, that the plaintiffs' Fourteenth Amendment claim fails.

21. Similarly, since the defendants did not act to deny blacks the right to vote for school board members for racially discriminatory reasons, the plaintiffs' Fifteenth Amendment claim is unsuccessful.

22. The effect of the appointive system may be more detrimental on the local level in counties such as Buckingham and Halifax where there is a significant disparity between the percentage of blacks in the population and the racial composition of the school board. From this statistical evidence, the court may infer intent to racially discriminate in the application of the appointive process in these counties. *See Mayor of Philadelphia v. Education Equality League*, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974). The plaintiffs, however, have not demonstrated that the appointive system is responsible for this disparity. The testimony adduced at trial and in the depositions submitted into evidence suggests that although blacks comprise a large portion of the population, they are not seeking school board seats in numbers consistent with their percentage of the population. The

parties stipulated that since December 27, 1971, every black who has formally requested appointment by the Buckingham County School Trustee Electoral Board has been appointed to the school board. (Stipulations with Buckingham County, Stipulation 6). In Halifax County, blacks have not been appointed for reasons unrelated to the appointive system. For example, William Coleman nominated a black for a school board seat. The candidate withdrew and a white was nominated and appointed in his stead. In the other named jurisdictions—Nottoway County, Prince Edward County, and the City of Petersburg, the plaintiffs have similarly failed to demonstrate that the disparity between black representation on school boards and their percentage of the population results from the appointive process. In these localities, the disparity would be cured by a change in one seat on the school board. The plaintiffs have failed to demonstrate that the appointive process hinders them in gaining one more seat on these school boards.

23. Under section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (1986) the plaintiffs must demonstrate that the proscription of a "voting qualification or prerequisite to voting or standard, practice or procedure ... which results in a denial or abridgment of the right of any citizen ... to vote" was motivated by race. To establish their claim under section 2, the plaintiffs need only prove that the statute relating to voting has a discriminatory effect; discriminatory purpose need not be proved. *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

24. The Voting Rights Act seeks to purge the political process of all means employed to diminish minority voting power, specifically including "shifts from elective to appointive office." H.Rept. 97–227, 97th Cong., 2d Sess. 18 (1982), U.S. Code Cong. & Admin.News 1982, p. 177.

25. Section 2 of the Voting Rights Act is applicable to statutes predating the enactment of the Act. Each instance of the continuing operation of the appointive process is a new or continuing violation of Section 2 if the effects of the decision are currently felt by the black population. *See*

Summary Judgment Memorandum Opinion at 16–17.

26. Only Arlington County could have a claim under the Voting Rights Act since it is the only jurisdiction which could have chosen to elect its school board members. Since no resident of Arlington is a plaintiff in this suit, that cause of action is not before the court. Moreover, any injustice resulting from the General Assembly's act has probably passed. As noted earlier, the plaintiffs have failed to prove that the appointive system has a discriminatory impact on blacks on a statewide or local level. Consequently, even if section 2 of the Voting Rights Act was construed broadly to encompass the claims of the plaintiffs in this action, that cause of action would fail. The appointive scheme does not have a present discriminatory effect upon blacks.

27. The plaintiffs' requests for injunctive and declaratory relief are denied. Judgment is entered for the defendants and against the plaintiffs, and this action is dismissed with prejudice.

Let the Clerk send a copy of these Findings of Fact and Conclusions of Law to all counsel of record.

### FINAL ORDER

This matter came before the Court for a trial to the bench. Pending before the Court are the plaintiffs' requests for certification of plaintiff and defendant classes and their claims under the Fourteenth and Fifteenth Amendments and the Voting Rights Act.

For the reasons stated in the accompanying Findings of Fact and Conclusions of Law, the plaintiffs' requests for class certification are DENIED. The plaintiffs' requests for injunctive and declaratory relief are also DENIED. Judgment is entered for the defendants and against the plaintiffs on all of the plaintiffs' claims, and this action is dismissed with prejudice.

Let the Clerk send a copy of this final order to all counsel of record.