the Southern Christian Leadership Conference; Citizens for a Better America, Plaintiffs–Appellants,

v.

VIRGINIA STATE BOARD OF ELECTIONS; et al., Defendants–Appellees,

and

Robert P. Lawler, in his official capacity as a member of the Board of Supervisors of Halifax County, Defendant.

No. 88–2919.

United States Court of Appeals, Fourth Circuit.

Argued June 8, 1989.

Decided Nov. 24, 1989.

Rehearing and Rehearing In Banc Denied Jan. 9, 1990.

Darius IRBY; John S. Neal; Charles W. White; James Samuel Williams, Jr.; Cora Lee Tucker; Willie Powell; Milton Richardson; the Virginia Unit of

Neil Bradley (Kathleen L. Wilde, Laughlin McDonald, Derek Alphran, Atlanta, Ga., ACLU Foundation, Inc., Susan L. Quig-Terry, ACLU, Gerald T. Zerkin, Gerald T. Zerkin & Associates, Richmond, Va., on brief), for plaintiffs-appellants.

Gail Starling Marshall, Deputy Atty. Gen. (Mary Sue Terry, Atty. Gen., Stuart, Va., H. Lane Kneedler, Chief Deputy Atty. Gen., Guy W. Horsley, Jr., Sr. Asst. Atty. Gen., Richmond, Va., E.M. Wright, Com. Atty., Buckingham, Va., William W. Bennett, Jr., Halifax, Va., Robert A. Bruce, Farmville, Va., County Attys., Michael R. Packer, City Atty., Petersburg, Va., on brief), for defendants-appellees.

Before PHILLIPS, MURNAGHAN, and WILKINSON, Circuit Judges.

MURNAGHAN, Circuit Judge:

A number of black residents and two civil rights organizations brought an action challenging Virginia's method of local school board selection as violating the First, Thirteenth, Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 et seq. of the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq. Virginia law requires appointment, rather than election, of local school board members. The plaintiffs allege that Virginia adopted and maintained the appointment system with the intent to discriminate against blacks, and that the system currently has a discriminatory effect. The district court refused plaintiffs' request for class certification.

The district court granted summary judgment for the defendants on the First and Thirteenth Amendment claims, as well as that portion of the Fourteenth Amendment claim that relied on the Due Process Clause. 692 F.Supp. 610. A trial proceeded on the equal protection, Fifteenth Amendment and Voting Rights Act claims.

After trial, the district judge found for the defendants on all remaining claims. The plaintiffs appealed.

I.

The case was brought by seven individual black citizens who reside in the City of Petersburg or in the counties of Nottoway, Buckingham, Prince Edward or Halifax, and by two organizations—Citizens for a Better America and the Virginia Unit of the Southern Christian Leadership Conference. The suit named three sets of defendants: (1) members of the appointing bodies for local school boards in Petersburg and the four Virginia counties named above; (2) members of the Electoral

Boards of each of those five jurisdictions; and (3) Susan H. Fitz–Hugh, Secretary of the State Board of Elections.

The method of appointing school board members varies widely among Virginia's counties and cities. In Nottoway and Buckingham counties, a three-person selection commission, whose members are chosen by a local circuit court judge, appoint the school board members. The county Board of Supervisors appoints school board members in Prince Edward and Halifax counties. The City Council selects Petersburg's school board members.[1]

The appointive system for selection of school board members in Virginia dates to 1870, when the state legislature passed a law providing for appointment of local school trustees by the state Board of Education. The trustees performed functions similar to those of present-day school boards. The district court found no evidence "that the original decision to make school boards appointive rather than elective was motivated by racial discrimination." *Irby v. Fitz–Hugh*, 693 F.Supp. 424, 427 (E.D.Va.1988). The court also found conflicting evidence as to whether discriminatory intent motivated various modifications in the appointive scheme between 1870 and the turn of the century. *Id.*

However, discriminatory intent did figure prominently in Virginia's decision to retain the appointive system during the Virginia Constitutional Convention of 1901–02. That convention drafted a new constitution that the state concedes was designed, in part, to disenfranchise blacks. During the convention, the state education commission proposed adopting a system of electing school board members. The convention rejected the proposal, however, after several delegates warned that such a change could lead to selection of blacks for school boards. The district court found that

> [r]ace was a 'substantial' or 'motivating' factor ... behind the 1901–02 Constitutional Convention's decision to retain an

appointive system. Several members of the Convention cast the decision in racial tones, and the plain purpose of the Convention was to disenfranchise as many impoverished people, including most blacks, as the delegates could.... The appointive system was maintained, therefore[,] for constitutionally impermissible reasons in 1902.

*Irby*, 693 F.Supp. at 432 (citations omitted).

The state legislature made some modifications to the appointive system in 1903. In the 1920s and 1930s, it rejected various recommendations to adopt an elective system for local school boards. The district court found no racial motivation in those decisions. *Id.* at 433.

In 1947, the General Assembly departed from the purely appointive scheme by passing a law permitting "any county operating under the county manager plan ... and in which county magisterial districts have been abolished" to hold popular elections to fill school board positions. *Id.* at 428. At the time, only Arlington County had a form of government allowing it to qualify for the election option. Arlington County voters approved the changes and elected a school board.

The elective system continued in Arlington County until 1956, when the County school board agreed to desegregate its school system in compliance with *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The state legislature, in an effort "to impede Arlington's ability to comply with court-ordered desegregation," *Irby*, 693 F.Supp. at 433, repealed the 1947 law that had allowed elected school boards. The new law proclaimed that "no school board shall be elected by popular vote in and for any county or city." *Id.* at 428.

Between 1968 and 1971, Virginia considered changes in its constitution. The plaintiffs concede that one of the purposes for the constitutional revision "was to close the door on the era of massive resistance to school integration." Virginia established a

---

1. In some Virginia jurisdictions, none of which are defendants here, the county board of supervisors and the city council jointly appoint the

school board where the school district overlaps the city and county boundaries. Va.Code § 22.1–53.

Constitutional Revision Commission in 1968 to recommend changes to the 1902 Constitution. The commission made no recommendation for changing the school board selection method. The district court found that debates leading to adoption of the new constitution showed "no evidence that the means of selecting school boards was tainted by racial considerations." *Irby*, 693 F.Supp. at 429. The court further found that legislators "simply could not agree on which method was the best and put the debate off to another day by agreeing to preserve the flexibility that currently existed." *Id.* The district court never pointed to specific details of those debates to show what arguments legislators made in support of the appointive system.

The state legislature considered the school board selection process again in 1984 by commissioning a study to decide whether school board members should be popularly elected. The 1984 subcommittee report took no stance on the issue but reported the various arguments for and against electing school boards. Many of the arguments arose at public hearings that the subcommittee held throughout the state. The arguments in favor of appointed school boards included:

(1) insulating school governance matters from direct political pressures;

(2) promoting stable school board membership;

(3) encouraging the service of individuals who would not seek elective office;

(4) promoting diversity in viewpoints which otherwise may not achieve representation on an elected school board;

(5) avoiding the division of fiscal authority among multiple elected bodies;

(6) avoiding the fragmentation of local political authority; and

(7) avoiding the problem of single issue campaigns which frequently occur with elected school boards.

Since issuance of the study in 1984, the Virginia legislature has considered various bills to allow popular election of school board members. *Irby*, 693 F.Supp. at 429, n. 1. It is unclear, however, to what extent legislators discussed or considered the findings of the 1984 study in rejecting those bills.

Turning to the issue of black participation on school boards, the district court found that the percentage of school board seats in Virginia held by blacks increased from 12% in 1974 and 1981 to 15.9% in 1985 and to 18% in 1986 and 1987. *Irby*, 693 F.Supp. at 430. The court also found that blacks comprised 18% of the voting age population in Virginia. *Id.*

However, all five jurisdictions at issue in the present case reported a smaller black representation on their school boards than in their population as a whole. The district court found the following disparities in 1987:

| | General Population | School Board |
|---|---|---|
| Buckingham | 42% black | 14.2% black |
| Halifax | 40% " | 22.2% " |
| Nottoway | 37% " | 20% " |
| Prince Edward | 37% " | 25% " |
| City of Petersburg | 61% " | 44.4% " |

*Irby*, 693 F.Supp. at 430.

## II.

To establish an equal protection violation, a plaintiff must show discriminatory intent as well as disparate effect. *Crawford v. Board of Education*, 458 U.S. 527, 544, 102 S.Ct. 3211, 3221, 73 L.Ed.2d 948 (1982); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The plaintiffs argue that once they prove the state adopted or maintained the appointive system in the past for discriminatory reasons, the burden then shifts to the defendants to prove that the system is not currently being maintained for discriminatory purposes. We need not decide whether the Equal Protection Clause mandates the burden-shifting scheme proposed by the plaintiffs because, even assuming that the burden shifted to the defendants, they have proved that racial discrimination no longer motivates Virginia's decision to retain an appointive system for selecting school board members.

The plaintiffs satisfied their initial burden of proving that Virginia maintained the appointive system for purposes of minimizing or precluding black participation on school boards. The district court expressly found that the Constitutional Convention of 1901–02 retained the appointive system for racially discriminatory reasons. *Irby*, 693 F.Supp. at 432. Moreover, the Virginia legislature clearly acted with a discriminatory purpose in passing the 1956 law forbidding popularly elected school boards anywhere in the state. As the district court found, the state legislature passed the law to impede one school district's willingness to comply with the desegregation mandate of *Brown v. Board of Education. Irby*, 693 F.Supp. at 428.

The defendants, however, have proved that the state does not currently maintain the system of appointed school boards for discriminatory reasons. The district court held that the defendants had carried that burden by "demonstrating that at least since 1971 the system has not been maintained for racially discriminatory reasons." *Id.* at 433. Specifically, the district court found such proof in the 1971 revision of the state constitution. In the atmosphere of the United States, which has had to suffer the complexities of a massive Civil War, reconstruction, *Plessy v. Ferguson,* massive resistance, and *Brown v. Board of Education,* it is understandable that there is abroad a skepticism that the 1971 constitutional revision represented sufficient proof that Virginia had purged the discriminatory intent originally underlying the appointive system for school boards. Although all parties agree that a major purpose of the revision was to break with the massive resistance policies of the past, the 1971 redrafting of the constitution did not involve any alterations of the school board selection process and apparently no debate over the relative merits of appointed and elected school boards. Although the 1971 constitution wrought dramatic (and racially

progressive) changes in other areas pertaining to education, one cannot readily assume that such breaks with the past carried over to the school board selection provision which was retained without change and with virtually no debate.

Nonetheless, the district court also relied on a much more persuasive piece of evidence in finding that the defendants had met their burden of rebutting the inference of discriminatory intent. The court pointed to the 1984 study commissioned by the state legislature to evaluate the pros and cons of elected and appointed school boards. That study clearly set forth solely legitimate reasons for choosing an appointed school board over a popularly elected body. The evidence also showed that the state legislature subsequently considered bills that would have changed the law to allow elected school boards. The district court did not clearly err in finding such evidence sufficient to demonstrate a lack of discriminatory intent in the current maintenance of the appointive system.[2] Accordingly, the plaintiffs' equal protection claim must fail.

### III.

■ The Supreme Court has emphasized that "racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation." *Mobile v. Bolden,* 446 U.S. 55, 62, 100 S.Ct. 1490, 1497, 64 L.Ed.2d 47 (1980) (plurality opinion). *Accord, Washington v. Finlay,* 664 F.2d 913, 919 (4th Cir.1981). Since the defendants proved the absence of discriminatory intent in the current maintenance of the appointive system for school boards, the plaintiffs cannot establish a Fifteenth Amendment violation.

### IV.

Plaintiffs purport to assert a due process claim under the Fourteenth Amendment. However, they raise no arguments in sup-

---

**2.** The district court's findings would be more convincing had it investigated the legislative debate over the various bills to determine whether supporters of appointed school boards articulated the arguments found in the 1984 study.

Nonetheless, the district court's failure to discuss the content of the legislative debates after 1984 does not necessitate reversing its factual findings as clearly erroneous.

port of the claim other than those asserted under their equal protection claim. In reality, their claim is one alleging a violation of equal protection rather than of due process. The district court properly dismissed the plaintiffs' Fourteenth Amendment Due Process claim.

## V.

■ Plaintiffs' voting rights claim presents a closer question, if the question is properly before us at all. Whereas a plaintiff must prove discriminatory intent to succeed on a claim under the Equal Protection Clause or the Fifteenth Amendment, a showing of discriminatory effect may suffice to establish a violation of Section 2 of the Voting Rights Act of 1965. *See Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986), *citing* S.Rep. No. 97–417, p. 28 (1982).

At the outset, we have considerable doubt as to whether Virginia's choice of an appointive system over an elective scheme for selecting school board members even implicates Section 2 of the Voting Rights Act. The defendants argue that Section 2 applies only where the state decides to choose officials through an election. The language of Section 2 offers some support for the defendants' position:

A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the *electorate* to participate in the political process and to *elect* representatives of their choice.

42 U.S.C. § 1973(b) (emphasis added). The defendants argue that where no one, black or white, has the right to participate in a popular election of school board members, Section 2 is inapplicable. The few courts that have addressed the issue have found Section 2 inapplicable to appointive offices. *Searcy v. Williams,* 656 F.2d 1003, 1010 (5th Cir. Unit B 1981) (school board), *aff'd*

*without op. sub nom. Hightower v. Searcy,* 455 U.S. 984, 102 S.Ct. 1605, 71 L.Ed.2d 844 (1982); *Williams v. State Board of Elections,* 696 F.Supp. 1563, 1568–69 (N.D. Ill.1988) (state circuit judges). *See also Dillard v. Crenshaw County,* 831 F.2d 246, 251 n. 12 (11th Cir.1987).

■ Nonetheless, we will refrain from holding Section 2 inapplicable here because of the ambiguity of congressional intent. In such a circumstance as the present one, concluding, as we do, that, even if applicable, Section 2 has not been violated, we are reluctant to rush to decision that it does not apply when decision is not required and a situation similar to but not identical with what is here presented may arise in a subsequent case. The situation is one calling for us to eschew *dictum* although, *seen in the light of the instant case,* it appears more probable than not that Section 2 is not applicable to appointive offices. Congress clearly believed that the choice between an elective and an appointive scheme implicated Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, which requires certain jurisdictions in the United States to obtain "preclearance" of proposed changes in procedures or requirements that could affect voting rights. *See* S.Rep. 97–417 at 6–7, *reprinted in* 1982 U.S.Code Cong. & Admin.News 183; *Perkins v. Matthews,* 400 U.S. 379, 389–90 n. 8, 91 S.Ct. 431, 437 n. 8, 27 L.Ed.2d 476 (1971); *Robinson v. Alabama State Dep't of Education,* 652 F.Supp. 484, 485 (M.D.Ala.1987); *County Council v. United States,* 596 F.Supp. 35, 38 (D.D.C.1984). In addition, Congress recently expressed concern about shifts from appointive to elective systems in discussing the 1982 amendments to the Voting Rights Act, but failed to make clear whether such shifts implicated only Section 5 of the Act or Section 2 as well. *See* H.Rep. 97–227, 97 Cong. 2d Sess. 18 (1982) (discussing "discriminatory elements of the elections process such as at-large elections, high fees and bonding requirements, *shifts from elective to appointive office....*" (emphasis added)).

Congress did not necessarily intend that acts covered by § 5 would also implicate

§ 2. Section 5 covers only certain jurisdictions in the country, those which Congress has found to have the worst record of voting discrimination. *See* S.Rep. 97–417 at 15, *reprinted in* 1982 U.S.Code Cong. & Admin.News 192. Congress might have wished to keep a closer eye on those states than on jurisdictions with a more benign history in voting matters. We have some doubts as to whether Congress intended the scope of Section 2 to extend so broadly as to encompass a state's choice between an elective and an appointive system for filling a given office, even when that choice was made years before enactment of the Voting Rights Act. Extending Section 2 that far could have dramatic and far-reaching effects.

We leave open the question whether Section 2's reach extends so broadly. Even if Section 2 applied here, the plaintiffs have failed to prove that the appointive system for school boards has produced discriminatory results. The plaintiffs argue that they have shown two types of discriminatory effects: (1) blacks are underrepresented on school boards in relation to their numbers in the general population, and (2) blacks are underrepresented in the offices or governing bodies that ultimately appoint school board members. However, we conclude that the district court did not clearly err in finding that the appointive system did not create discriminatory effects insofar as the representation of blacks on school boards is concerned. Moreover, insofar as the plaintiffs challenge the racial composition of the officials who appoint school board members, they seek relief that far exceeds the scope of this lawsuit, which focuses on the selection of school boards rather than on the manner of choosing the selecting officials.

First, we examine the alleged underrepresentation of blacks on school boards. Clearly, no disparity exists on a statewide basis. The district court found that in Virginia as a whole, "blacks comprised approximately 18% of the voting population and approximately 18% of all school board members statewide." *Irby*, 693 F.Supp. at 433–34. However, we believe the proper comparison must focus not on the state-wide averages, but rather on the figures for the five local jurisdictions at issue in this appeal: Buckingham, Halifax, Nottoway, and Prince Edward counties and the City of Petersburg.

Although the district court found a "significant disparity" in Buckingham and Halifax counties between the percentage of blacks in the population and the racial composition of the school boards, the court found no proof that the appointive process caused the disparity. *Irby*, 693 F.Supp. at 434. The court's findings on this point are not clearly erroneous. The evidence showed that "although blacks comprise a large portion of the population, they are not seeking school board seats in numbers consistent with their percentage of the population." *Id.* For example, since late 1971 every black individual who formally requested appointment to the Buckingham County School Board was placed on the board. In Halifax County, the evidence showed at least one instance where a black individual was nominated for the school board but voluntarily withdrew before appointment.

In the other three jurisdictions, the district court discounted the significance of the disparities between the percentage of the population that was black and the percentage of school board seats held by black individuals. In Nottoway and Prince Edward counties, the addition of one extra black on each school board would cure the disparity. Most, though not all, of the statistical disparity would vanish in Petersburg if one more black were appointed to the school board. The wide statistical swing produced by the addition of a single black school board member in each of the three jurisdictions raises serious doubts as to whether the disparities are statistically significant. The defendants produced expert testimony discounting the statistical significance of the figures in the defendant jurisdictions. Moreover, the Supreme Court has recognized the dangers of drawing conclusions from statistics involving boards with relatively few members. *See Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 611, 94

S.Ct. 1323, 1328–29, 39 L.Ed.2d 630 (1974) (upholding district court finding that there was no significance in the differences between the percentage of blacks on a board and the percentage of blacks in the city's population; "the number of positions on the Panel was too small to provide a reliable sample; the addition or subtraction of a single Negro meant an 8% change in racial composition."). The panel at issue in *Educational Equality League* had 13 members. *Id.* None of the school boards at issue in the present case has more than nine members; one has only five members.

In sum, the district court did not clearly err in finding that the appointive system did not produce discriminatory effects insofar as black representation on school boards was concerned. The evidence cast considerable doubt on the existence of a causal link between the appointive system and black underrepresentation in Buckingham and Halifax counties. In addition, the plaintiffs failed to establish that the disparities in the other three jurisdictions were statistically significant.

Alternatively, the plaintiffs attempt to prove discriminatory effects by focusing on the racial makeup of the officials who appoint school board members in the defendant jurisdictions. The plaintiffs argue that blacks are denied the opportunity to participate equally in the appointment process because most of the officials who select school board members are themselves white. Plaintiffs assert that blacks are underrepresented on the governing bodies that appoint school board members in Petersburg and in Halifax and Prince Edward counties. In Buckingham and Nottoway counties, *white* circuit judges appoint the selection commission which in turn chooses the school board members.

We reject the plaintiffs' attempt to prove a discriminatory impact by focusing on the racial makeup of the officials who appoint, either directly or indirectly, the school board members. First, to the degree that blacks are underrepresented on the elected governing bodies in Halifax and Prince Edward counties and the City of Petersburg, the plaintiffs' remedy is to bring a suit under the Voting Rights Act challenging directly the electoral schemes for choosing members of those bodies. Plaintiffs have not mounted such a direct challenge in the present case. As for the fact that *white* judges are ultimately, though indirectly, responsible for selection of school board members in Buckingham and Nottoway counties, the plaintiffs have produced no evidence of racial discrimination in the selection of those judges. Circuit judges in Virginia are generally chosen by the state legislature. Va.Code § 17–121. Yet the plaintiffs have produced no evidence as to the circumstances surrounding the legislature's selection of the circuit judges for Buckingham and Nottoway counties. Many questions are unanswered. For example, did black legislators support the white circuit judges who were ultimately selected? Were the judges endorsed by white legislators who had received widespread black support in the most recent election? The plaintiffs never attempt to answer these questions, but instead focus merely on the race of the circuit judges. The mere fact that the judges were white does not prove that discrimination existed.

In short, the district court did not clearly err in concluding that the appointive system did not have a discriminatory impact on blacks in the five defendant jurisdictions. Having proved no discriminatory effect, the plaintiffs cannot establish a violation of Section 2 of the Voting Rights Act of 1965, even if it applies (a matter of some doubt).

## VI.

■ Having found no violations of the Equal Protection Clause and the Fifteenth Amendment, we likewise conclude that plaintiffs' First and Thirteenth Amendment claims must fail. In voting rights cases, the protections of the First and Thirteenth Amendments "do not in any event extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments." *Washington v. Finlay*, 664 F.2d 913, 927 (4th Cir.1981), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1333 (1982).

## VII.

In conclusion, the plaintiffs have failed to establish a violation of Section 2 of the Voting Rights Act of 1965 or of the First, Thirteenth, Fourteenth or Fifteenth Amendments. The judgment of the district court is

AFFIRMED.